No. 24601.

John F. Allardice, Dr. Dalrie Berg, Lee F. Carlson, Arthur Karas, and Harold W. Peterson v. Adams County, a political subdivision of the State of Colorado, E. G. Waymire, Glen Lancaster, and Jerry Yost, as Commissioners of Adams County, and Ralston Purina Company, a Missouri corporation.

(476 P.2d 982)

Decided November 16, 1970.

134

136

CALKINS, KRAMER, GRIMSHAW and HARRING, BROOKE
WUNNICKE, for plaintiffs in error.

DAWSON, NAGEL, SHERMAN and HOWARD, THOMAS B.
FAXON, for defendant in error Ralston Purina Company.

DAVID BERGER, for defendants in error Adams County,
E. G. Waymire, Glen Lancaster and Jerry Yost.

*En Banc.*

MR. JUSTICE KELLEY delivered the opinion of the Court.

ALLARDICE, Berg, Carlson, Karas and Peterson, tax-
payers of Adams County, filed this lawsuit against Adams
County, its commissioners and Ralston Purina Company,
a Missouri corporation, to test the validity of revenue
bonds which the county proposes to issue pursuant to
the terms of the Colorado Economic Development Rev-
enue Bond Act of 1967, Perm. Supp., 1967, C.R.S. 1963,

36-24-1, *et seq.* It is conceded that the bond proceedings comply in all respects with the provisions of the Act. The questions to be resolved, therefore, relate to the validity of certain provisions of the Act when tested primarily by provisions of the state constitution, and additionally, as to one point, by the Fourteenth Amendment to the Federal Constitution.

Adams County, pursuant to the Act, adopted a resolution which authorized and approved: (1) the issuance of bonds in the aggregate principal amount of $2,000,000; (2) use of the bond proceeds to acquire an agricultural feed plant (Ralston Purina Project); (3) the execution of a Lease and Agreement with Ralston Purina Company providing that the lessee pay rent sufficient to pay all bond obligations as they become due, maintenance of and insurance on the project, and an amount in lieu of, but equal to, taxes on the project; and lessee having the option, after the bonds are paid, of buying the project for $1,000; and (4) a mortgage and indenture of trust, naming a private out-of-state trustee, covering all *project* properties, revenues, and the lease, to be executed by the county as mortgagor to secure payment of the bonds.

Further, in conformity with a requirement of the Act, Section 7 of the Resolution states that neither the bonds nor the interest thereon shall impose any pecuniary liability on the county, nor be a charge against its general credit or taxing powers, but shall be payable *only* out of project revenues.

In addition to asking the court to declare the Act and the proceedings invalid, the Taxpayers sought to enjoin the county and its commissioners from issuing the bonds to acquire the project, and to enjoin Ralston Purina Company from executing the documents essential to carry out the proposed financing of the project.

The trial court entered its judgment in favor of the county, its commissioners and Ralston Purina Company, holding that the Economic Development Revenue Bond

Act is constitutional. We agree with the trial court and therefore affirm.

The Act authorizes cities and counties to issue revenue bonds to finance the acquisition of real and personal properties for manufacturing or industrial enterprises; to lease, with option to purchase, such properties to private lessees for operation as projects; and, to secure payment of the revenue bonds by mortgage of the project property and by pledge of project revenues and the lease.

The Taxpayers present seven basic questions for our resolution. We will consider them in the order of their significance.

This is the initial challenge to reach this court as to the validity of the Economic Development Revenue Bond Act. Similar enactments have been challenged in our sister states. The employment of public revenue bonds to foster the promotion of local industry is not a new concept. See *Uhls v. State*, 429 P.2d 74 (Wyo., 1967), for an analysis of cases on the subject. The weight of authority sustains the validity of such laws. *DeArmond v. Alaska State Development Corporation*, 376 P.2d 717 (Alaska 1962); *Wayland v. Snapp*, 232 Ark. 57, 334 S.W.2d 633 (1960); *Green v. City of Mt. Pleasant*, 256 Iowa 1184, 131 N.W.2d 5 (1964); *Norvell v. City of Danville*, 355 S.W.2d 689 (Ky. 1962); *City of Frostburg v. Jenkins*, 215 Md. 9, 136 A.2d 852 (1957); *Opinion of the Justices*, 161 Me. 182, 210 A.2d 683, 696 (1965); *City of Gaylord v. Beckett*, 378 Mich. 273, 144 N.W.2d 460 (1966); *Albritton v. City of Winona*, 181 Miss. 75, 178 So. 799 (1938); *Village of Deming v. Hosdreg Co.*, 62 N.M. 18, 303 P.2d 920 (1956); *Gripentrog v. City of Wahpeton*, 126 N.W.2d 230 (N.D. 1964); *Elliott v. McNair*, 250 S.C. 75, 156 S.E.2d 421 (1967); *Clem v. City of Yankton*, 160 N.W.2d 125 (S.D. 1968); *Holly v. City of Elizabethton*, 193 Tenn. 46, 241 S.W.2d 1001 (1951); *Allen v. Tooele County*, 21 Utah 2d 383, 445 P.2d 994 (1968); *State v. Demus*, 148 W.Va. 398, 135 S.E.2d 352 (1964); *Uhls v. State, supra*.

I.

The key issue is: Does the Act contravene Article XI, Section 1 of the Colorado constitution? We hold that it does not.

Article XI, Section 1 provides:

"Neither the state, nor any county, city, town, township or school district shall lend or pledge the credit or faith thereof, directly or indirectly, in any manner to, or in aid of, any person, company or corporation, public or private, for any amount, or for any purpose whatever; or become responsible for any debt, contract or liability of any person, company or corporation, public or private, in or out of the state."

The argument is that revenue bond financing, as authorized by the Act, constitutes the pledging of credit for a private corporation, and subjects the county to the debt, contract and liability of a private corporation in contravention of Article XI, Section 1.

The Taxpayers concede that "under Colorado law, public revenue bonds do not create debt, if there is no pledge of public property. *Davis v. Pueblo,* 158 Colo. 319, 406 P.2d 671; *Ginsberg v. City and County of Denver,* 164 Colo. 572, 436 P.2d 685." The "if" is created by certain language in *McNichols v. City and County of Denver,* 123 Colo. 132, 230 P.2d 591.

In *Davis v. Pueblo, supra,* and in *McNichols,* the bond resolutions both authorized the respective city councils not only to pledge the revenue from the parking facilities which were to be acquired from bond funds, but, also, to pledge the revenue derived from parking meters, which, but for the bond resolution, would go into the general fund of the cities. The court in those cases did not hold that such a pledge contravened the constitutional proscription against the pledging of the city's credit.

The use, as part of the security mechanism, of a mortgage of the parking facility to be erected with the bond

funds, prompted the court in *McNichols* to use this language in invalidating the bonds:

"If the bonds in question were solely revenue bonds *Shields v. Loveland, supra,* is authority to the effect that they could be considered *not to have increased the indebtedness of the city.* But when the city consents to mortgage its assets to secure the payment of its debt, *the bonds become more than mere revenue bonds and, for the reason stated, must be deemed to have increased the outstanding indebtedness of the city.* Their payment can be enforced not merely by applying revenues thereto, but by the appointment of a receiver and the foreclosure of the city's capital assets." (Emphasis added.)

The italicized portion of the quote, plus additional language which we will subsequently refer to, shows clearly that the McNichols court was not relating the pledge problem to Article XI, Section 1, but to a constitutional provision *limiting the amount of municipal indebtedness.* Article XI, Section 8. The court made this clear at the beginning of its discussion of the issue when, after conceding that where the bonds are payable from the operating revenues they are valid, it said:

"When, however, the off-street parking properties, after being acquired by the city, are mortgaged under a trust indenture to secure payment of the bonds, then the bonds by that very act become more than revenue bonds — they become mortgage bonds; and *when the city mortgages its property to secure a bonded indebtedness, it follows that a debt has been created within the meaning of a constitutional provision limiting the amount of municipal indebtedness.*" (Emphasis supplied.)

Again, to emphasize the point, the court subsequently in its opinion noted:

"In oral argument counsel for the city stated that the indebtedness of the City and County of Denver had so nearly reached its legal limit that the off-street parking bonds were made revenue bonds so as to avoid any question of their causing the city to exceed its debt limit.

\* \* \* What we here emphasize is that off-street parking bonds, unlike bonds relying *solely* upon revenues for their payment, do in fact increase the outstanding indebtedness of the City and County of Denver."

As will appear from a further analysis of the transaction under attack here, no issue exists as to "debt limits."

The court in *McNichols,* continued:

"The distinction can be seen by what happens in the event of default. The recourse of the holder of the revenue bonds continues to be the right to the revenue from the facility; the holder of the mortgage bond, however, can foreclose on the physical assets under the mortgage and to that extent render the city that much poorer by becoming possessed of its property that has been mortgaged."

As already noted, the Taxpayers concede that revenue bonds *per se* do not violate Article XI, Section 1. We have demonstrated that the issue here was not before this court in *McNichols. McNichols,* therefore, does not stand for the proposition contended for by the Taxpayers.

In order to determine whether the county, by the terms of the transaction here, is pledging its credit or becoming responsible for a debt or liability "of any person, company or corporation, public or private," we must scrutinize the whole transaction, including the effect of the mortgage.

As previously noted, the history of the bond proceedings shows literal adherence to every requirement of the Act, so that an examination of the statutes is tantamount to an examination of the bond proceedings of the county commissioners and the bonds themselves.

The Act, the resolution and the bonds, all state that the bonds issued by the county shall be special, limited obligations; that the principal of and interest on such bonds shall be payable, subject to the mortgage provisions, solely from the rents of the project, 36-24-5(1); that the bonds "shall never constitute the debt or indebtedness of the county \* \* \* within the meaning of any

provision or limitation of the state constitution, * * * and shall not constitute nor give rise to a pecuniary liability of the county or municipality or a charge against its general credit or taxing powers." 36-24-5(2). Also, see 36-24-11.

The bonds are secured by a pledge of the revenues, a pledge of the lease and a mortgage of the project, 36-24-7; and it is solely to this security which bondholders may look for payment of interest and redemption of their investment. This they know. Hence, they rely on the credit of the lessee — Ralston Purina — and not Adams County.

Finally, the Act expressly denies right or power to the county to pay out of its general fund or to otherwise contribute any part of the costs of acquiring the project or to use land already owned or in which it has an equity, 36-24-18.

It is of significance in connection with consideration of this argument to note that the Act prohibits the county from using its power of eminent domain in acquiring land to be used for the project, 36-24-21.

The Act was passed with full knowledge by the general assembly of the decisions of this court approving revenue bond financing, including *McNichols v. City and County of Denver, supra.*

The legislature has left no doubt that the bondholders must look exclusively to the revenues of the project for the payment of principal and interest. The Taxpayers, regardless of the soundness (or unsoundness) and the success (or lack of success) of the project, will not be called upon to pay any part of the bonded indebtedness. The general revenues of the county cannot be used to any extent nor in any manner to pay principal or interest of the bonds.

Since the project is wholly and completely financed out of the bond proceeds, the county, in the event of a default and foreclosure of the mortgage, would be in no worse situation after the foreclosure than it was prior

to the initiation of the project. In fact, in all probability, it would be better off to the extent of the taxes that the project would thereafter generate.

In *Uhls v. State*, 429 P.2d 74 (Wyo. 1967), the Wyoming Supreme Court, in testing a similar economic development statute by a constitutional provision similar to Article XI, Section 1 of our constitution, concluded that where the legislature has carefully and explicitly restricted the lending of credit, and expressly excluded any general liability on the part of the governmental entity involved, the legislature and bondholders, and not the courts, will be responsible for any untoward results from this type of financing. The court in making this point observed:

"We have to recognize the inherent right of parties to contract as they see fit. If a bond purchaser, with his eyes wide open, sees fit to purchase revenue bonds of the Frontier Project for the sake of a Federal tax advantage, he certainly will be on notice of the fact that there will never be any pecuniary liability against the City of Cheyenne, and that he will be able to look only to the revenues of the project and the project property itself for payment of his bonds. With it expressed clearly in the law and on the face of each bond that neither the credit nor taxing power of the municipality is pledged, no bondholder will ever be heard to say he was deceived or that he thought otherwise."

The most recent expression of this court on this constitutional issue is *Ginsberg v. Denver*, 164 Colo. 572, 436 P.2d 685, wherein this court said:

"* * * Does the proposal under consideration amount to an illegal pledge of the credit of the city for the benefit of a private corporation?

"This question is answered in the negative. As previously stated, there is no pledge of the credit of Denver on the bonds and no debt of Denver is created. On the contrary, the bonds themselves clearly show that Denver shall in no event be looked to for payment or be liable there-

fore. The bond buyers in this case have specified that an independent firm should investigate and confirm the feasibility of the project. Thus from the terms of the ordinance, the bonds themselves and the purchase proposal, it is obvious that no reliance will be placed on the credit of the city."

## II.

■ The Taxpayers contend that the revenue bond financing authorized by the Act and the resolution unlawfully creates county debt without the required election and for unauthorized purposes in contravention of Article XI, section 6 of the constitution of Colorado.

Taxpayers' position here is closely related to that discussed in Part I above and to a large measure relies upon the ruling in *McNichols v. City and County of Denver, supra.*

The pertinent portion of Article XI, Section 6 reads: "No county shall contract any debt by loan in any form except for the purpose of erecting necessary public buildings, making or repairing public roads and bridges; *and such indebtedness contracted in any one year shall not exceed the rates upon the taxable property in such county following,* to-wit: * * * *and the aggregate amount of indebtedness of any county for all purposes, exclusive of debts contracted before the adoption of this constitution, shall not at any time exceed twice the amount above herein limited, unless when in manner provided by law,* the question of incurring such debt shall, at a general election, be submitted to such of the qualified electors of such county as in the year last preceding such election shall have paid a tax upon property assessed to them in such county, and a majority of those voting thereon shall vote in favor of incurring the debt; * * *." (Emphasis added.)

The Taxpayers argue that the "debt" created by the revenue bonds is "unlawful, because a feed manufacturing plant is not one of the designated purposes for which county debt may be incurred, nor was the project

financing submitted to the electors of Adams County for their approving vote."

The Taxpayers further contend that the instant case falls squarely within the holding of *McNichols v. City and County of Denver, supra,* and, therefore, the proposed county financing cannot be consummated unless the mortgage is eliminated therefrom, or, unless the court expressly overrules the McNichols case.

The Taxpayers, in arguing their point under this constitutional provision, as they did under Part I, concede that the application of the "special fund doctrine" would be sufficient to take the county's obligation out from under the proscriptions relating to "debt," were it not for the *mortgage* on the project property.

In their brief the Taxpayers did not include the underscored (italicized) language of the constitutional provision. Without the additional language the true intent of the provision is not apparent. This is a *debt limitation* and not a *debt proscription* provision.

What we said in Part I in reference to *debt* is applicable here; *i.e.,* since there is no pledge of the credit of Adams County for the payment of the bonds no "debt" is thereby created. Consequently, the issuance of the bonds has no effect whatsoever on the debt limitations prescribed in Article XI, Section 6.

Since it is not a "debt" within the meaning of that term as used in the constitutional provision, the mechanics of securing the obligations of those who advance the funds for the project is constitutionally immaterial.

III.

■ The Taxpayers assert that the revenue bond financing authorized by the Act fails to serve a bona fide public purpose, and thereby deprives Taxpayers of substantive due process of law, in contravention of Article II, Section 25 of the constitution of Colorado and of the Fourteenth Amendment to the United States Constitution.

Article II, Section 25 provides:

"No person shall be deprived of life, liberty or property without due process of law."

Section 1 of the Fourteenth Amendment provides:

"No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

The argument under the "due process" clauses of these constitutional provisions is that the proposed financing favors one private enterprise over another engaged, or wishing to engage, in the same business in the same locality. In short, the financing is for the private benefit of Ralston-Purina; there is no assurance a competitor would receive the same consideration; and consequently the project is not for a public purpose.

The Taxpayers assert that:

"* * * even in the absence of a specific constitutional provision therefor, nevertheless the public purpose doctrine is established as a basic constitutional tenet, and public industrial bonds must be tested in its light."

And continuing, the Taxpayers argue that:

"Where a specific constitutional requirement of 'public purpose' is lacking, the courts have relied upon due process provisions as the applicable source of the doctrine — and the Taxpayers so rely here."

The legislative purpose is stated in the Act, 36-24-3; it reads:

"It is the intent of the general assembly by the passage of this article to authorize counties and municipalities to acquire, own, lease, improve, and dispose of properties to the end that such counties and municipalities may be able to promote industry and develop trade by inducing manufacturing, industrial, and commercial enterprises to locate in or remain in this state, in order to assist in relieving the serious threat of extensive unemployment in parts of this state, in securing and maintaining a

balanced and stable economy in all parts of this state, and in furthering the use of its agricultural products and natural resources. It is, therefore, the intention of the general assembly to vest such counties and municipalities with all powers that may be necessary to enable them to accomplish such purposes, which powers shall in all respects be exercised for the benefit of the inhabitants of this state for the promotion of their safety, welfare, convenience, and prosperity. It is not intended by this article that any county or municipality shall itself be authorized to operate any such manufacturing, industrial, or commercial enterprise. This chapter shall be liberally construed in conformity with this declaration of purpose."

Although the expressed intent of the legislature has no magical quality which validates the invalid, it is entitled to reverent weight in determining whether the Act promotes a public purpose. It has been appropriately said, the inquiry into the validity of an Act of the legislature is an inquiry whether the will of the people as expressed in the law is or is not in conflict with the will of the people, as expressed in the constitution; and unless it be clear that the legislature has transcended its authority, the courts will not interfere. Every presumption in favor of the validity of questioned legislation is indulged in by courts in testing its constitutionality. *People ex rel. Rogers v. Letford,* 102 Colo. 284, 79 P.2d 274.

A recent pronouncement by this court appears in *Ginsberg v. Denver,* 164 Colo. 572, 436 P.2d 685. It is of particular interest here because it involved revenue bond financing of a stadium to be leased to a private corporation. In Ginsberg, this court said:

"* * * The determination of what is a public purpose is primarily for the legislative body, and if not clearly and palpably wrong the courts will not disturb the legislative determination. In *City and County of Denver v. Hallett,* 34 Colo. 393, 83 P. 1066, this court stated:

"* * * The test is whether the power, if exercised, will

promote the general objects and purposes of the municipality, and of this the legislature is the judge in the first instance; and unless it clearly appears that some constitutional provision has been infringed, the law must be upheld.'

"In *Milheim v. Moffatt Tunnel District,* 72 Colo. 268, 211 P. 649, this court quoted with approval the following language:

" 'But what is for the public good, and what are public purposes, and what does properly constitute a public burden, are questions which the legislature must decide upon its own judgment, and in respect to which it is vested with a large discretion which cannot be controlled by the courts, except perhaps where its action is clearly evasive, and where, under pretense of a lawful authority, it has assumed to exercise one that is unlawful.'

"The modern trend is to expand and liberally construe the term 'public purpose.' This is recognized in 2 E. McQuillin, Municipal Corporations, § 10.31 at 817 (3d ed. 1966) and C. Rhyne, Municipal Law, §§ 15-3, 15-4. See also 37 Am. Jur., Municipal Corporations, § 120."

The general assembly's desire to afford a vehicle to aid in the relief of extensive unemployment, to maintain a balanced and stable economy and to promote the use of the state's agricultural products represents a valid public purpose. *Wayland v. Snapp,* 232 Ark. 57, 334 S.W.2d 633.

Although Taxpayers rely on the Fourteenth Amendment's "due process" clause to attack the validity of the Act, the only federal authority cited in support of the argument is *Loan Association v. Topeka,* 87 U.S. (20 Wall.) 655, 22 L.Ed. 455. In *Loan Association,* the City of Topeka was being sued to recover on overdue interest coupons attached to bonds which the city had issued.

The following quotation from that opinion throws further light on the facts and the ruling relied upon by Taxpayers:

"But in the case before us, in which the towns are au-

thorized to contribute aid by way of taxation to any class of manufacturers, there is no difficulty in holding that this is not such a public purpose as we have been considering. *If it be said that a benefit results to the local public of a town by establishing manufacturers, the same may be said of any other business or pursuit which employs capital or labor. The merchant, the mechanic, the innkeeper, the banker, the builder, the steamboat owner are equally the promotors of the public good, and equally deserving of the the* (sic) *aid of the citizens by forced contributions.* No line can be drawn in favor of the manufacturer which would not open the coffers of the public treasury to the importunities of two-thirds of the businessmen of the city or town." (Emphasis supplied.)

The italicized portion was cited by Taxpayers in support of their *Fourteenth Amendment* argument. It has no real application to the facts in the instant case. The holding of the court, almost entirely, rested on the proposition that where "forced contributions," that is, taxes, are taken from *all* the people, the government cannot donate those revenues to *one* or *a few.*

Elsewhere in the opinion we find this language which seems to be more appropriate to the facts in the case before us:

"If these municipal corporations, which are in fact subdivisions of the State, and which for many reasons are vested with *quasi legislative powers,* have a fund or other property out of which they can pay the debts which they contract, *without resort to taxation,* it may be within the power of the Legislature of the State to authorize them to use it in aid of projects strictly private or personal, but which would in a secondary manner contribute to the public good; or where there is property or money vested in a corporation of the kind for a particular use, as public worship or charity, the Legislature may pass laws authorizing them to make contracts in reference

to this property, and incur debts payable from that source." (Emphasis added.)

Also, see *Carmichael v. Southern Coal Co.*, 301 U.S. 495, 57 S.Ct. 868, 81 L.Ed. 1245.

Here, as noted above, the county is not authorized to (and could not under the law) use general county funds, nor is it in any manner responsible for any shortages or deficiencies which may occur as the result of the development or the operation of the project. The county is under no obligation whatsoever which can affect its tax revenues. It is giving up nothing. It is not, therefore, donating anything.

*Loan Association v. Topeka, supra,* was decided in 1875. To the extent that it derogates from our holding, we feel that time has diminished its impact. In 1954, the same court in *Williamson v. Lee Optical of Oklahoma,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563, speaking through Mr. Justice Douglas, observed:

"The day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought. * * * [citations omitted]. We emphasize again what Chief Justice Waite said in *Munn v. Illinois,* 94 U.S. 113, 134, 24 L.Ed. 77, 87, 'For protection against abuses by legislatures the people must resort to the polls, not to the courts.' "

We are unable to find a sufficient lack of public benefit to require us to hold that the announced legislative purpose is not a valid "public purpose."

We hold that the Act successfully passes the constitutional tests raised by Taxpayers in this division of the opinion.

### IV.

Another argument advanced by the Taxpayers is that,

"The provisions of the Act and the resolution, including the lease and mortgage approved and confirmed by the

resolution, contain delegations of power in contravention of Article V, Section 35 and Article XIV, Section 8, Colorado Constitution."

To put the Taxpayers' contention in context it is necessary to have the pertinent portions of the two constitutional provisions before us:

*Article V, Section 35:*
"The general assembly shall not delegate to any special commission, private corporation or association, any power to make, supervise or interfere with any municipal improvement, money, property or effects, whether held in trust or otherwise, or to levy taxes or perform any municipal function whatever."

*Article XIV, Section 8:*
"There shall be elected in each county, at the same time at which members of the General Assembly are elected, commencing in the year nineteen hundred and fifty-four, and every four years thereafter, * * *; one treasurer who shall be collector of taxes; * * *."

The delegations which are proscribed by Article V, Section 35 are only those which can be properly classified as the performance of "any municipal function whatever." From an examination of the Act, the lease and the mortgage we conclude that there has been no delegation of "any municipal function" to the trustee.

The fact that the project is for a "public purpose" does not necessarily make its existence or its function *municipal* in nature. It is the *effect of*, or the benefits flowing from, the completed project and its operation by private enterprise that fulfills the "public purpose" requirement discussed in Part II above and not, per se, the county's participation therein. The participation as a "lessor" does not constitute a "municipal function."

The trustee, under the terms of the financing documents, performs no "municipal functions" and exercises no control over a "municipal improvement" within the usual meaning of those terms.

The Act prohibits county (1) operation of the project,

36-24-3 and 36-24-19; and (2) expenditures from the general fund or other contributions by the county to the acquisition of the project, 36-24-18. The Supreme Court of Kentucky, in denying a challenge similar to that of the Taxpayers, in *Gregory v. City of Lewisport,* 369 S.W.2d 133 (Ky., 1963), observed that the provisions relating to the trustee are normal and customary details for borrowing transactions; that the local government does not, by virtue of the transaction, surrender any of its governmental powers. We agree with the Kentucky court.

This court, in *Fladung v. Boulder,* 165 Colo. 244, 438 P.2d 688, laid to rest this phase of Taxpayers' argument, so far as the appointment of a receiver and his collection of the payments in case of default is concerned. Mr. Justice Day, in *Fladung,* noted:

"Section 17 is alleged to be void because it provides that in the event of a default in payment to the bondholders a receiver may be appointed to collect the assessments levied against the properties in the district and make payments to the bondholders. This, it is argued, is an illegal delegation of power to a nongovernmental entity and is an unconstitutional interference with the governmental functions of the city. We find no merit in this argument. A receiver appointed in the eventuality anticipated in the ordinance would not be dealing with public moneys as that term is normally construed. Likewise the receiver would not be vested with power to levy taxes or otherwise interfere with the governmental functions of the city officials but would be limited to the function of collecting, receiving and applying the assessments levied by law. [Note limitations are also placed on the trustee in the case at bar, it is the limiting of the functions that is important.]"

Mr. Justice Day concluded:

"It is neither an illegal delegation of power nor interference with governmental functions. It is merely a means of dealing with the mechanics of marshalling the

improvement assessments should a financial crisis arise."
Also, see *Uhls v. State, supra.*

### V.

■ Another argument advanced by the Taxpayers is that the proposed bond issue violates Article V, Section 38 of the Colorado constitution because, under the terms of the agreement the county assigns Ralston Purina's rent liability to the trustee, who, in turn, collects the rentals, extinguishing the lessee's liability without payment into the public treasury.

Article V, Section 38 reads:
"No obligation or liability of any * * * corporation, held or owned by * * * any municipal corporation therein, shall ever be exchanged, transferred, remitted, released or postponed, or in any way diminished by the general assembly, nor shall such liability or obligation be extinguished except by payment thereof into the proper treasury."

What we have said in Part IV, in reference to the delegation of authority, is applicable here. Particularly as to "payment thereof into the proper treasury." In addition, it is the apparent purpose of this constitutional provision to protect obligations and liabilities owned by municipal corporations. *Fergus County v. Osweiler,* 107 Mont. 466, 86 P.2d 410. The protection is against *diminution* by the general assembly. The general assembly has provided authority *to create* the indebtedness which is not proscribed.

### VI.

■ The Taxpayers challenge the validity of 36-24-15 which authorizes the county to grant the lessee an option to purchase the project at a stipulated price. It also authorizes the county, as lessor, and the lessee to agree that the rentals paid by the lessee prior to and at the time of the exercise of such an option be applied toward the purchase price and that such rentals shall be in full or partial satisfaction thereof.

The lease and agreement grants to Ralston Purina the

option to purchase the project on certain conditions, including the full payment of all principal and interest on the bonds, plus the payment of $1,000 to Adams County.

The Colorado constitutional provisions relied upon by the Taxpayers are Article XI, Section 2 and Article X, Section 14.

Article XI, Section 2, in material part, reads:

"Neither the state, nor any county * * * shall make any donation or grant to, or in aid of, or become a subscriber to, or shareholder in any corporation or company, or a joint owner with any person, corporation or company, or a joint owner with any person, company or corporation, public or private, in or out of the state, except as to such ownership as may accrue to the state by escheat, or by forfeiture, by operation or provision of law;"

Taxpayers' argument is that the county is paying $2,000,000 for the project and is, in effect, selling it to Ralston Purina for $1,000, thus the county is making a *donation* of $1,999,000. This kind of arithmetic ignores the true facts of the transaction.

By the terms of the lease and agreement Adams County is agreeing at the outset to sell the project to Ralston-Purina for $2,001,000 at some future point in time. In the interim, Ralston-Purina is required to pay all interest, insurance and maintenance charges and an amount equal to and in lieu of taxes. Finally, upon the retirement of the $2,000,000 bond issue and the payment to the county of $1,000, title to the project is transferred to Ralston-Purina.

The county had nothing, so far as the project is concerned, when it entered into the lease and agreement; it will not furnish any property or funds for the purchase and development of the project; it will fulfill the "public purpose" and after the "sale" of the property to Ralston-Purina it will have a substantial addition to its tax base. By no stretch of logic can it be said that the county, under these circumstances, has *donated* anything to Ralston-Purina.

Other jurisdictions which have been confronted with a similar problem have held that the option to purchase is an appropriate and integral part of the entire transaction between the county and the lessee. *Uhls v. State*, 429 P.2d 74 (Wyo. 1967); *Elliott v. McNair*, 250 S.C. 75, 156 S.E.2d 421; *Green v. City of Mt. Pleasant*, 256 Iowa 1184, 131 N.W.2d 5; *State v. Bane*, 148 W.Va. 392, 135 S.E.2d 349; *Darnell v. County of Montgomery*, 202 Tenn. 560, 308 S.W.2d 373.

Article X, Section 14, is not applicable to the factual situation here as will be apparent from a cursory examination of its provisions. It reads:

"Private property shall not be taken or sold for the payment of the corporate debt of municipal corporations."

Section 14 is to protect private property from judgment creditors of a city. This court, in *People ex rel. Rogers v. Letford*, 102 Colo. 284, 79 P.2d 274, speaking in reference to this provision, said:

"This section only means that a creditor of a municipality may not levy upon and sell the private property of individuals within the corporation to pay the debt of the municipality."

VII.

In their final argument the Taxpayers contend that the obligation to make annual payments "in lieu of," but in the same amount as, taxes on the county-owned project violates the following constitutional provisions, which in pertinent part read:

*Art. X, Sec. 3:*

"All taxes shall be uniform upon each of the various classes of real and personal property located within the territorial limits of the authority levying the tax, and shall be levied, assessed, and collected under general laws, * * *."

*Art. X, Sec. 4:*

"The property, real and personal, of the * * * counties * * * shall be exempt from taxation."

*Art. X, Sec. 8:*
"No county * * * shall be released or discharged from * * * its proportionate share of taxes to be levied for state purposes."

*Art. X, Sec. 9:*
"The power to tax corporations and corporate property, real and personal, shall never be relinquished or suspended."

*Art. X, Sec. 10:*
"All corporations in this state, or doing business therein, shall be subject to taxation for state, county, school, municipal and other purposes, on the real and personal property owned or used by them within the territorial limits of the authority levying the tax."

The Act was designed to fully comply with the above provisions. Section 36-24-20 of the Act makes this clear. It reads:

"(1) Pursuant to section 4 of article X of the state constitution, all property owned by a county or municipality pursuant to this article shall be and remain exempt from taxation. Nevertheless, any county or municipality acquiring or extending any project as provided in this article, shall annually pay, solely out of the rentals of the project and not from any other source, to the state of Colorado and to the city, town, school district, and any other political subdivision or public body corporate wherein such project shall be located, authorized to levy taxes, a sum equal to the amount of tax which such taxing entity or entities would annually receive if the property were owned by any private person or corporation, any other statute to the contrary notwithstanding. In addition to the requirements of sections 36-24-13 and 36-24-14, the governing body, before entering into a lease pursuant to this article, shall make a prior determination of sufficiency of rentals for the purposes of this section, and each lease shall provide for rentals sufficient to meet the payments required by this section.

"(2) If and to the extent the proceedings under which

the bonds so provide, the county or municipality may agree to cooperate with the lessee of a project in connection with any administrative or judicial proceedings for determining the validity or amount of any such payments and may agree to appoint or designate and reserve the right in and for such lessee to take all action which the county or municipality may lawfully take in respect of such payments and all matters relating thereto, but such lessee shall bear and pay all costs and expenses of the county or municipality thereby incurred at the request of such lessee or by reason of any such action taken by such lessee in behalf of the county or municipality.

"(3) Any lessee of a project which has paid, as rentals additional to those required to be paid pursuant to section 36-24-14, the amounts required by subsection (1) of this section to be paid by the county or municipality, shall not be required to pay taxes on such property to the state or to any such county, city, town, school district, or other political subdivision, any other statute to the contrary notwithstanding.

"(4) Each lease entered into pursuant to this article shall expressly state that the lessee waives any right and privilege he may have to challenge the validity of this section. Any lease omitting such statement shall be void."

▮▮▮ The defendants in error, in answer to Taxpayers' arguments, suggest that,

"As the power of the legislature to enact law and prescribe the procedure for raising revenue to support the government is plenary, except as limited by the inhibitions of the federal and state constitutions, no act of that department will be declared invalid unless its repugnance to the fundamental law is clear and beyond reasonable doubt. *People ex rel. Colorado Tax Commission v. Pitcher,* 56 Colo. 343, 348, 138 Pac. 509 (1914). It has also been said of a revenue measure that, if it is susceptible to two interpretations, one of which brings it into compliance with, and the other in violation of, the Constitution, the former interpretation shall be adopted.

*Chicago, Burlington and Quincy Railroad v. School District,* 63 Colo. 159, 165, 166, 165 Pac. 260 (1917)."

With this we agree. We also agree that the Act is constitutional when tested by each of the provisions set forth above.

In an effort not to unnecessarily prolong an unduly long opinion, a brief statement as to why the Act meets the several challenges in Part VII follows:

Article X, Section 3. If the rentals "in lieu of taxes" can be considered *taxes* there is no lack of uniformity. Section 36-24-20 authorizes the taxing of all lessees of "projects" on the same basis. The *tax* on other property and the *rents* on municipal property for industrial uses operate equally and uniformly on all persons and corporations in like circumstances.

Article X, Section 4. The property of the county, by the Act, is specifically exempted from tax. It is only the interest of the lessee — the leasehold, upon which the charge in lieu of taxes is made. See *Rummel v. Musgrave,* 142 Colo. 249, 350 P.2d 825.

Article X, Sections 8, 9 and 10. These provisions proscribe the legislative power to impair the financial base of government operations. Section 36-24-20 imposes an obligation on a lessee (Ralston-Purina) to contribute its full proportionate share of state, county, school and other governmental subdivision expenses. This is in compliance with the constitutional mandate of Sections 8, 9 and 10.

The Economic Development Revenue Bond Act having successfully withstood the seven challenges of the Taxpayers, the judgment of the trial court is affirmed.