The **BOARD OF COUNTY COMMISSIONERS OF the COUNTY OF ARAPAHOE,** Colorado; John J. Nicholl, in his official capacity as County Commissioner of the County of Arapahoe; Jeannie Jolly, in her official capacity as County Commissioner of the County of Arapahoe; John J. Nicholl, a resident of the County of Arapahoe; and Jeannie Jolly, a resident of the County of Arapahoe, Plaintiffs–Appellants and Cross–Appellees,

v.

**E–470 PUBLIC HIGHWAY AUTHORITY,** a body corporate and political subdivision of the State of Colorado; Margaret N. Carpenter; Nadine Caldwell; Donald Hamstra; James R. Sullivan; Harold E. Kite; Greg Lopez; and Thomas R. Eggert, in their official capacities as Directors of the E–470 Public Highway Authority; and The State of Colorado, Defendants–Appellees and Cross–Appellants.

No. 93CA1292.

Colorado Court of Appeals,
Div. IV.

March 24, 1994.

Rehearing Denied April 28, 1994.

Certiorari Granted Oct. 11, 1994.

414

Tallmadge, Wallace, Hahn, Smith & Walsh, P.C., David J. Hahn, John W. Smith, III, Edward J. Walsh, Cynthia A. Calkins, Denver, Susan Broyles, Sp. Counsel to Arapahoe County, Greenwood Village, for plaintiffs-appellants and cross-appellees.

Ankele, Icenogle, Norton & White, P.C., Charles E. Norton, T. Edward Icenogle, Holme, Roberts & Owen, Daniel S. Hoffman, Jeffrey A. Chase, Denver, for defendants-appellees and cross-appellants.

Opinion by Judge ROTHENBERG.

Plaintiffs, the Board of County Commissioners of Arapahoe County, John J. Nicholl, in his official capacity as County Commissioner of Arapahoe County and as a resident of Arapahoe County, and Jeannie Jolly, in her official capacity as County Commissioner of Arapahoe County and as a resident of Arapahoe County (Arapahoe County officials), appeal from the judgment of the trial court entered in favor of defendants, E–470 Public Highway Authority, Margaret N. Carpenter, Nadine Caldwell, Donald Hamstra, James R. Sullivan, Harold E. Kite, Greg Lopez, and Thomas R. Eggert, in their official capacities as Directors of the E–470 Public Highway Authority, and the State of Colorado (for simplicity, defendants are hereinafter referred to collectively as the E–470 Authority defendants). The E–470 Authority defendants cross-appeal from the judgment of the trial court entered in favor of Arapahoe County officials on one issue raised in their counterclaim.

We hold that because it is an "enterprise" and not a "district," the E–470 Public High-

way Authority is *not* subject to the election provisions of Colo. Const. art. X, § 20 (Amendment One). We reverse that portion of the trial court's judgment holding to the contrary. In all other respects, we affirm.

## I.

### The First E–470 Authority

In February 1985, the "First E–470 Authority" was formed by an Intergovernmental Agreement (the IGA) among Arapahoe, Adams, and Douglas Counties. In July 1985, the City of Aurora was added to the First E–470 Authority by an amendment. At the time the First E–470 Authority was formed, the Public Highway Authority Law did not exist and the First E–470 Authority had no express power to issue bonds.

On August 1, 1986, Arapahoe County officials entered into a joint Memorandum of Understanding with the other governments participating in the First E–470 Authority for the "planning, funding, and construction" of a "limited access highway" designated as E–470. The Memorandum of Understanding gave Arapahoe County officials the right to decide the alignment of E–470 in unincorporated Arapahoe County.

The parties agreed that Arapahoe County officials would issue special obligation revenue bonds to defray the costs of the E–470 project. On August 27, 1986, Arapahoe County officials adopted a Master Resolution, supplemented by the First Supplemental Resolution, which authorized the issuance of $722,010,000 of Arapahoe County Bonds, the execution of a Pledged Funds Agreement, and a Remarketing Agreement.

On August 28, 1986, Arapahoe County officials issued $722,010,000 of special obligation revenue bonds called "Arapahoe County, Colorado Capital Improvement Trust Fund Highway Revenue Bonds (E–470 project) Series 1986A—1986M" (the bonds). The bonds were issued pursuant to the County Capital Improvement Trust Fund Financing Act, § 30–26–501, et seq., C.R.S. (1986 Repl. Vol. 12A) (the Trust Fund Act).

According to the Official Statement for the original bond issue, the bonds were payable only from identified revenue sources and were "not in any way to be construed to be a debt or liability of the State of Colorado or any political subdivision thereof. . . ." The Official Statement also provided that the timing of the bond issue was in large measure motivated to take advantage of the opportunity to issue bonds before changes in the federal tax laws might impair the ability to do so in the future.

As contemplated by the Master Resolution and First Supplemental Resolution, the bonds were issued to pay the costs of constructing E–470 and to fund related reserves and insurance expenses. Pending such use, however, the major portion of the net proceeds from the sale of the bonds was deposited in pledged accounts (one for each series, A–M). The proceeds were then used to purchase government obligations maturing and bearing interest at rates sufficient to pay fully the principal of the bonds and all accrued interest thereon through the interest rate periods.

As each interest rate period for each series of bonds expired and accountant's verifications were received, the remarketing agent for Arapahoe County re-set the interest rate and remarketed the bonds. A similar pledged account was then established for each series of the bonds (roll over). The First E–470 Authority derived arbitrage earnings with regard to each of these roll overs. Arbitrage earnings are the difference between the interest earned on the allowable investments and the interest on the bonds paid to bondholders.

Before each six-month interest payment date, a determination was made as to which of two approaches to setting the interest rate would be pursued. As long as the bonds remained in a six-month interest rate mode, at the time the interest rate of the bonds was to be converted to a rate fixed to maturity, the interest rate on the bonds would be reset by the remarketing agent at the lesser of 15% per annum or a rate necessary to remarket the bonds at par.

From August 31, 1987, until February 28, 1989, all of the bonds were remarketed at a recomputed rate, either every six months as called for in the original bond documents, or

for longer or shorter periods which Arapahoe County officials consistently approved by amendment to the bond documents.

## II.

### The Public Highway Authority Law

Approximately one year after the bonds were issued in 1986, the General Assembly passed the Public Highway Authority Law, § 43–4–501, et seq., C.R.S. (1993 Repl.Vol. 17) (the PHA Law). This 1987 law authorized the formation by intergovernmental agreement of political subdivisions known as "public highway authorities," to finance, construct, operate, or maintain a beltway or other transportation improvements in a metropolitan region.

The PHA Law grants a public highway authority the power to issue its own revenue bonds and to take advantage of the sources of revenue including vehicle registration fees and tolls for highway use.

Pursuant to the PHA Law, on January 13, 1988, Arapahoe County officials and the other participants in the First E–470 Authority formed the E–470 *Public Highway Authority* by a contract (the Establishing Contract). The cities of Aurora, Brighton, and Thornton, and the town of Parker subsequently became parties to the Establishing Contract and member governments of the E–470 Public Highway Authority.

The Establishing Contract provided that the E–470 Public Highway Authority was entitled to all rights and privileges of the First E–470 Authority and was entitled to assume all obligations and liabilities of the First E–470 Authority. These rights, obligations, responsibilities, and liabilities were assigned to the E–470 Public Highway Authority by resolution of the First E–470 Authority.

The Establishing Contract also provided it was to be:

further the intent of the governmental units that the [E–470 Public Highway] Authority shall be entitled to all rights and privileges, and shall assume all obligations and liabilities, of Arapahoe County with respect to bonds previously issued by Arapahoe County for the planning, designing, engineering, acquisition, installation, construction and reconstruction of E–470.

In November 1988, the electors of the counties within the E–470 Public Highway Authority's voting boundaries approved the collection of a vehicle registration fee to fund E–470.

In December 1988, the parties to the Establishing Contract entered into the Second Amendment to the Establishing Contract. Under its terms, the parties deleted from the Establishing Contract: (1) the requirement of ratification by all parties and approval of the preliminary design and construction plans for E–470; and (2) approval of "the issuance or assumption of any Bonds or the incurrence of any indebtedness, including the terms thereof, and including refundings thereof."

On January 1, 1989, Arapahoe County officials entered into the Delegation and Substitution Agreement (the Delegation Agreement) with Adams and Douglas Counties and the City of Aurora. Pursuant to the Delegation Agreement, the parties agreed "to delegate all of their rights and responsibilities under the Memorandum of Understanding to the original Authority on the condition that the original Authority redelegate such rights and responsibilities to the [E–470 Public Highway Authority]." That delegation occurred in an attachment to the Delegation Agreement.

On February 28, 1989, proceeds of the Series 1986D bonds in the amount of $63,-260,000 were released from the pledged account and remarketed, backed by a pledge of E–470 Public Highway Authority revenues that included motor vehicle registration fees, tolls, and excess investment earnings (arbitrage profit) from the bond proceeds. In addition, a letter of credit from Union Bank of Switzerland secured the Series 1986D bonds. The proceeds of the Series 1986D bonds were then used to pay a portion of the construction costs and related expenses for segment I of E–470. This use of bond proceeds for construction is known as a "roll out." The balance of the bonds remained secured by separate pledged accounts.

From February 28, 1989, through March 1, 1993, the remaining $658,750,000 in principal amount of bonds were remarketed, either at the six-month interest rate period or for shorter or longer periods routinely approved by Arapahoe County officials.

For the remarketings which occurred in February 1989, August 1990, February 1991, and March 1992, Arapahoe County officials adopted supplemental resolutions immediately before each remarketing. Those supplemental resolutions contained amendments to the Master Resolution and the First Supplemental Resolution to facilitate the upcoming remarketing and to release bond proceeds from escrow as soon as possible.

In connection with the remarketings, Arapahoe County officials executed closing certificates and other documents. Arapahoe County officials also indirectly participated in all of the remarketings.

After removing the bonds from escrow in 1989, the E–470 Public Highway Authority proceeded with construction of Segment I of E–470, which opened to traffic in June 1991. The E–470 Public Highway Authority has collected tolls since 1991 from users of the road.

### III.

### The Current Controversy

In May 1993, the E–470 Public Highway Authority developed a plan for assessing the financial markets to enable the construction of E–470 to proceed (the Plan of Finance). One element of the plan is to convert all or a part of the 1986 bonds to a fixed rate of interest as provided in the First Supplemental Resolution and to release the proceeds from the pledged accounts and use them to fund construction and related costs.

Pursuant to the Plan of Finance, in order to complete the process of releasing the bond proceeds from escrow and to use the proceeds to construct E–470, the E–470 Public Highway Authority tendered to Arapahoe County officials the sixth, seventh, and eighth Supplemental Resolutions in June and July 1993. Arapahoe County officials refused to sign the sixth Supplemental Resolution.

As the trial court explained, Arapahoe County officials refused to sign the document as a result of the E–470 Public Highway Authority's decision to shift the alignment of the highway. Specifically, during 1992 and 1993, a number of alternative alignments of E–470 were developed to increase traffic on the highway and enhance revenues.

The Arapahoe County officials supported the realignment by the passage of Arapahoe County Resolution No. 476–92, in April 1992. However, on January 27, 1993, after a public hearing in which several residents and developers expressed strong opposition to a proposed realignment of the highway, the Arapahoe County officials repudiated their prior support of that realignment.

On June 1, 1993, certain amendments to the PHA Law contained in H.B. 1316 became law. H.B. 1316 expanded the potential boundaries of a public highway authority to a distance of two and one-half miles from the proposed centerline location of the highway. See § 43–4–506(3)(a), C.R.S. (1993 Repl.Vol. 17). In addition, under H.B. 1316 the board of any authority is now permitted to determine the location of the alignment of the highway by a two-thirds vote of the Board. See § 43–4–506(4), C.R.S. (1993 Repl.Vol. 17).

At a public hearing on June 30, 1993, the E–470 Public Highway Authority Board of Directors voted to include within the Authority's boundaries, certain property located two and one-half miles west of the originally proposed centerline of E–470. The reason for this inclusion was to allow construction of the realigned E–470 tollway within the boundaries of the E–470 Public Highway Authority. The Board also voted to approve shifting the alignment of E–470 to a new configuration.

Thereafter, the Arapahoe County officials filed the complaint in this action seeking a declaration that: (1) H.B. 1316 is unconstitutional; and (2) the proposed remarketing of the 1986 bonds violates Amendment One, passed by the electors on November 3, 1992.

The E–470 Authority defendants filed a counterclaim seeking relief under H.B. 1316 in the nature of a writ of mandamus and

seeking a declaration that: (1) H.B. 1316 is constitutional; (2) Amendment One is not applicable to the remarketing or the implementation of E–470's Preliminary Plan of Finance dated July 7, 1993; and (3) the E–470 Public Highway Authority is not a "district" as defined in Amendment One and therefore not subject to its restrictions.

The trial court entered judgment in favor of the E–470 Authority defendants finding that: (1) H.B. 1316 is constitutional; and (2) although the E–470 Public Highway Authority is a "district" and subject to Amendment One, the E–470 Public Highway Authority was not required to hold an election before remarketing the 1986 bonds or implementing the 1993 Plan of Finance. The court denied the E–470 Authority defendants' petition for writ of mandamus as unnecessary, finding that "since the County has already assigned to the [E–470 Public Highway] Authority all of its rights and privileges regarding the bonds, the [E–470 Public Highway] Authority, as assignee of [Arapahoe] County, is able to execute documents necessary for bond remarketing."

In a post-trial order, the trial court also granted the E–470 Authority defendants' motion to alter or amend judgment and ruled that "the collection and spending of revenues as proposed in the 1993 Plan of Finance is not subject to the election provisions of Amendment One."

## IV.

### Applicability of Amendment One

Arapahoe County officials first claim the trial court erred in finding that Amendment One does not apply to the E–470 Public Highway Authority's 1993 Plan of Finance. According to Arapahoe County officials, the re-issuance of bonds under the 1993 Plan of Finance is the creation of debt subject to the election requirements of Amendment One. We do not agree.

In a related issue, on cross-appeal, the E–470 Authority defendants contend the trial court erred in finding that the E–470 Public Highway Authority is a "district." The E–470 Authority defendants assert that the E–470 Public Highway Authority is an "enter-prise" and, as such, is not subject to the election provisions of Amendment One. We agree that the E–470 Public Highway Authority is an enterprise and not a district.

### A.

### The E–470 Public Highway Authority is an Enterprise

■ Importantly, Amendment One applies to, and requires voter approval for, only those entities that meet the definition of a "district." Amendment One provides:

*[D]istricts must have voter approval in advance for:* ...

(b) Except for refinancing district bonded debt at a lower interest rate ... *creation of any multiple-fiscal year direct or indirect district debt or other financial obligation* whatsoever without adequate present cash reserves pledged irrevocably and held for payment in all future fiscal years. (emphasis added)

Amendment One defines a district as "the state or any local government, excluding enterprises." Amendment One defines an "enterprise" as:

a government-owned business authorized to issue its own revenue bonds and receiving less than 10% of annual revenue in grants from all Colorado state and local governments combined.

Colo. Const. art. X, §§ 20(2)(b) and (d).

It is uncontroverted that the E–470 Public Highway Authority is authorized to issue its own revenue bonds, *see* § 43–4–509, C.R.S. (1993 Repl.Vol. 17), and according to the evidence introduced at trial, over 90% of the E–470 Public Highway Authority's revenues come from tolls and vehicle registration fees which it collects directly. Thus, the E–470 Public Highway Authority receives less than 10% of its annual revenues in grants.

As a result, the key remaining issue is whether the E–470 Public Highway Authority is a "government-owned business."

Although the term is not separately defined in Amendment One, generally, a "business" is an activity engaged in for gain, benefit, advantage, or livelihood. *Black's*

*Law Dictionary* 179 (5th ed. 1979). *Cf.* § 7–60–102(2), C.R.S. (1986 Repl.Vol. 3A) (As defined under the Uniform Partnership Law, business includes "every trade, occupation, or profession"); *Finlay v. Storage Technology Corp.*, 764 P.2d 62, 65 (Colo.1988) (for purposes of workers' compensation law, business is "that calling which one pursues for livelihood or gain.").

The E–470 Public Highway Authority was created for a specific purpose: to finance, construct, operate, and maintain a toll road. It is authorized to impose fees, tolls, rates, and charges for the privilege of traveling on the toll road. Section 43–4–506(1)(d), C.R.S. (1993 Repl.Vol. 17). It thus provides a service for a fee.

In addition, the E–470 Public Highway Authority is designed to be self-supporting and its assets are owned by the individual constituent governments. It is authorized to accept and hold the assets needed to construct, operate, and maintain the toll road, and, according to the terms of the Establishing Contract, the fixed assets are to be distributed to each participating unit of government that has territory where the assets are located.

In sum, the E–470 Public Highway Authority possesses the primary characteristics of a business. The business is government-owned, it has the authority to issue its own revenue bonds, and it receives less than 10% of its annual revenue in grants.

Accordingly, we hold that the E–470 Public Highway Authority falls within Amendment One's definition of an "enterprise" and is not subject to the election requirements of Amendment One.

In reaching this conclusion, we reject Arapahoe County officials' contention that *Submission of Interrogatories on Senate Bill 93–74*, 852 P.2d 1 (Colo.1993) requires a different result. In that case, our supreme court determined that the Great Outdoors Colorado Trust Fund Board was not an enterprise. However, there, the board in question did not have the power to issue revenue bonds and its revenues consisted exclusively of money collected by the Colorado Lottery Commission and distributed by the State Treasurer. Thus, we do not view the case as dispositive.

## B.

### Creation of the Debt

■ Even if we were to assume that the E–470 Public Highway Authority was a district rather than an enterprise, we would nevertheless reach the same result because we agree with the trial court that the remarketing of the revenue bonds as proposed in the 1993 Plan of Finance does not constitute the creation of a new debt. For this alternative reason, we hold that the election provisions of Amendment One do not apply here.

Amendment One requires voter approval in advance for the creation of any multiple-fiscal year district debt or other financial obligation. *See* Colo. Const. art. X, § 20(4)(b).

The trial court found that the principal amount of the debt, the security for the bonds, and the repayment mechanism for the bonds have remained the same since the initial issuance in 1986. And, according to the Master Resolution and bond documents, the bonds were payable from identified revenue sources, were not construed to be a debt or liability of Arapahoe County, and did not involve a pledge of private property. *See Allardice v. Adams County*, 173 Colo. 133, 139, 476 P.2d 982, 985 (1970) ("Public revenue bonds do not create debt if there is no pledge of private property.").

In addition, when the bonds were originally issued, there was no taxpayer burden, and there is none under the proposed 1993 Plan of Finance for remarketing the bonds. Nor is there any new tax burden created for Arapahoe County. Finally, the method for calculating interest as set forth in the Plan of Finance is the same as was provided for in the First Supplemental Resolution adopted in 1986.

In sum, releasing the 1986 bond proceeds from escrow does not create any new debt, impose any tax, or expose the taxpayers of Arapahoe County to any new liability or obligation. Accordingly, it does not constitute a "creation of debt" requiring voter approval in

advance. *See Submission of Interrogatories on Senate Bill 93–74, supra,* at 4 ("As presented to the electorate, [Amendment One] was designed to protect citizens from unwarranted tax increases."). *See also Ginsberg v. Denver,* 164 Colo. 572, 436 P.2d 685 (1968) (revenue bonds do not create a debt or indebtedness under [Colo. Const. art. XI, § 8]); *Metropolitan Water District of Southern California v. Dorff,* 138 Cal.App.3d 388, 188 Cal.Rptr. 169 (1982) (Proposition 13 requiring voter approval of bond issues does not extend to include approval for increase in interest rates on the already approved bonds.).

### C.

### Collection and Spending of Revenues

■ Arapahoe County officials also claim the trial court erred in finding that the collection and spending of revenues proposed in the 1993 Plan of Finance is not subject to the election provisions of Amendment One set out in Colo. Const. art. X, § 20(7)(d). Again, we disagree.

Colo. Const. art. X, § 20(7)(d) requires electoral approval for revenue and spending increases above the level fixed in Colo. Const. art. X, § 20(7)(a).

Sections 30–26–504(4)(a) and (b), C.R.S. (1986 Repl.Vol. 12A) limit the extent to which the county can control the funds in the county trust fund and appropriate or distribute them. Those sections permit distribution only "to the extent that such funds are not otherwise encumbered." Since the original issuance of the bonds in 1986, the funds were encumbered for payment to the E–470 Public Highway Authority for its operating expenses and for other payments required under the bond documents to bondholders.

Here, the Financing Agreement provides that the E–470 Public Highway Authority is required to make payments of revenues to the county trust fund to service the bonds that had been released from escrow. The Plan of Finance provides that the same arrangement will remain in place. More specifically, it provides that the E–470 Public Highway Authority intended to deposit revenues in the trust fund created in the Master

Resolution and apply those funds first to the payment of vehicle registration fee bonds secured by vehicle registration fees, and then to pay operating expenses required to operate and maintain the toll road so that it will produce tolls and other revenues sufficient to make other payments under the Plan of Finance.

Thus, as the trial court found, it was inherent within the bond contracts that future revenues would be received and spent by the E–470 Public Highway Authority for the purpose of operating the highway and repaying the indebtedness. Accordingly, the trial court correctly concluded that those revenues and expenditure agreements are outside the scope of Amendment One.

### V.

### Delegation of Rights and Obligations

Next, Arapahoe County officials contend the trial court erred in finding that Arapahoe County assigned and delegated to the E–470 Public Highway Authority all of its rights and obligations regarding the Trust Fund Bonds and the alignment of the highway. In the alternative, they contend that the trial court erred in finding Arapahoe County has no substantive rights under the Colorado Constitution to be free from legislative impairment of contracts. We disagree with both contentions.

### A.

■ Arapahoe County officials do not claim the Delegation Agreement is ambiguous. Nevertheless, they ask the court to go outside the document and consider the intent of the parties in assigning the rights and responsibilities for the bonds.

■ Written contracts that are complete and free from ambiguity express the intention of the parties and will be enforced according to their plain language. *In re May,* 756 P.2d 362 (Colo.1988).

Arapahoe County officials clearly and unambiguously assigned and delegated to the E–470 Public Highway Authority all of Arapahoe County's rights and obligations regarding the trust fund bonds and the alignment of

the highway. The Delegation and Substitution Agreement recited the provision of the then recently enacted Public Highway Authority Law, which allowed the formation of highway authorities "with power, among others, to finance, construct, and operate public highways, such as E–470, and to impose various taxes and fees."

Also, in the Delegation Agreement, the participating governments expressed their "desire that the [E–470 Public Highway Authority] assume more responsibility for the financing, construction and operation of E–470 and for the Bonds." It also provided:

> Pursuant to ... the [Memorandum of Understanding], the Participating Governments hereby mutually consent and agree to delegate all of their rights and responsibilities under the [Memorandum of Understanding] to the Original Authority on the condition that the Original Authority redelegate such rights and responsibilities to the [E–470 Public Highway Authority]. ...

The Memorandum of Understanding included, among other things, the obligation of Arapahoe County to issue and maintain the 1986 Bonds. On January 31, 1989, the E–470 Public Highway Authority accepted this delegation of responsibilities and rights in an attachment to the Delegation and Substitution Agreement.

Accordingly, the trial court correctly concluded that, under the plain and unambiguous language of the Delegation Agreement, Arapahoe County assigned and delegated to the E–470 Public Highway Authority its rights and obligations, including its rights regarding the trust fund bonds and the alignment of the highway. Arapahoe County officials' contention to the contrary is without merit.

### B.

■ Also without merit is Arapahoe County officials' alternate assertion that the Establishing Contract entered into between the parties which created the E–470 Public Highway Authority cannot be altered because of Colo. Const. art. XIV, § 18(2).

That constitutional provision states:

(a) Nothing in this constitution shall be construed to prohibit the state or any of its political subdivisions from cooperating or contracting with one another or with the government of the United States *to provide any function, service, or facility lawfully authorized to each of the cooperating or contracting units,* including the sharing of costs, the imposition of taxes, or the incurring of debt.

(b) Nothing in this constitution shall be construed to prohibit the authorization by statute of a separate governmental entity as an instrument to be used through voluntary participation by cooperating or contracting political subdivisions. (emphasis added)

■ This provision preserves the authority of the General Assembly over political subdivisions created pursuant to it. The General Assembly defines the powers of each contracting entity and, as such, it may alter those rights. And, except to the extent that the Colorado Constitution authorizes a county to act upon a subject, a county has only those powers that are expressly, or by necessary implication, delegated to it by the General Assembly. *See Oborne v. Board of County Commissioners,* 764 P.2d 397 (Colo. App.1988).

■ A municipal corporation has no privileges or immunities under the state constitution. Moreover, electors derive no such rights enforceable in behalf of the county and the city. *Enger v. Walker Field,* 181 Colo. 253, 508 P.2d 1245 (1973).

Here, since neither the General Assembly nor the constitution has delegated to a municipality the constitutional right to be free from legislation that impairs the obligations of contracts, Arapahoe County officials cannot assert a constitutional right which they do not possess.

### VI.

#### Constitutional Challenges

Arapahoe County officials also assert a number of additional constitutional challenges to H.B. 1316, all of which we reject below.

However, initially we note Arapahoe County officials raise for the first time on appeal the argument that the E–470 Authority defendants are estopped from denying the applicability of the provisions of the Colorado Constitution to the rights of Arapahoe County. Since this argument was not raised in the trial court, we do not address it. *Tenney v. Board of Assessment Appeals*, 856 P.2d 89 (Colo.App.1993).

■ A legislative act is presumed to be constitutional. The party challenging an act bears the burden of proving beyond a reasonable doubt that the act is unconstitutional. *See Firelock, Inc. v. District Court*, 776 P.2d 1090 (Colo.1989).

## A.

### Special Legislation

■ Arapahoe County officials claim that H.B. 1316 is special legislation in violation of Colo. Const. art. V, § 25. We disagree.

Colo. Const. art. V, § 25 provides, in relevant part:

The General Assembly shall not pass local or special laws in any of the following enumerated cases ... for ... laying out, opening, altering or working roads or highways ... granting to any corporation, association or individual any special or exclusive privilege, immunity or franchise whatever. In all other cases, where a general law can be made applicable no special law shall be enacted.

■ If an act is challenged as special legislation, and an enumerated prohibition is implicated, the threshold question is whether the classification adopted by the General Assembly is a real or potential class, or whether it is logically and factually limited to a class of one and thus illusory. If there is a genuine class, the next question is whether the classification is reasonable. Legislation is not prohibited special legislation if there is a genuine class and if the classifications are reasonable. *In re Interrogatory on House Bill 91S–1005*, 814 P.2d 875 (Colo.1991).

■ A law is not special when it is general and uniform in its operation upon all in a similar situation. *City of Montrose v. Public Utilities Commission*, 732 P.2d 1181 (Colo. 1987).

Here, the trial court found there is a genuine class which is not limited to one, and H.B. 1316 applies to all public highway authorities, whether existing or to be created in the future; nothing in the bill restricts it to the E–470 Public Highway Authority. *See In re Interrogatory on H.B. 91S–1005, supra* (bill structuring incentives to bring United Airline's facility to Colorado was not special legislation; even though United was the only facility to meet the statutory criteria, court found that another aviation-related entity could meet the statutory criteria in the future). *Cf. In re Senate Bill No. 95*, 146 Colo. 233, 361 P.2d 350 (1961) (legislation passed to allow Denver to annex Glendale involuntarily was special legislation because it was limited to characteristics that could describe only Glendale and provided for its automatic repeal in one year so that there was no possibility of it applying to any other municipality).

Also, the legislation is reasonably related to the Public Highway Authority Law's stated purpose which is to promote the "health, safety, and welfare of the citizens of [Colorado] by securing for them more adequate transportation." Section 43–4–502, C.R.S. (1993 Repl.Vol. 17). Thus, H.B. 1316 is not special legislation.

## B.

### Imposition of A New Liability

■ Next, Arapahoe County officials claim that application of H.B. 1316 to Arapahoe County's bonds is contrary to Colo. Const. art. XV, § 12 because it imposes on Arapahoe County new liabilities with regard to transactions or considerations already past. However, this constitutional provision is not applicable to municipal corporations or governmental subdivisions of the state or county. *School District No. 1 v. School District No. 7*, 33 Colo. 43, 78 P. 690 (1904).

## C.

### Retrospective Legislation

■ We also disagree with Arapahoe County officials' claim that H.B. 1316 is ret-

rospective legislation contrary to Colo. Const. Art. II, § 11 and therefore unconstitutional.

 Legislation is prospective when it operates on transactions that occur after its effective date. Legislation is presumed to have prospective effect unless a contrary intent is expressed by the General Assembly. *Ficarra v. Department of Regulatory Agencies,* 849 P.2d 6 (Colo.1993).

Here, the remarketing of bonds and release of bond funds and the vote to realign the highway are acts which occurred after the effective date of H.B. 1316.

### D.

### Release of Liability

 Finally, Arapahoe County officials contend that the application of H.B. 1316 is contrary to Colo. Const. art. V, § 38. Again, we disagree.

Colo. Const. art. V, § 38, grants to the State or to a municipal corporation the right not to have the General Assembly release or diminish any obligation or liability owed to it. The purpose of this provision is to protect the monetary obligations owned by municipal corporations. *See Allardice v. Adams County, supra,* 173 Colo. 133, 476 P.2d at 993. Arapahoe County would be entitled to invoke this constitutional provision if H.B. 1316 altered any obligation owed to it. *See City of Montrose v. Public Utilities Commission, supra.*

However, H.B. 1316 does not affect any monetary obligations owned by Arapahoe County. As the trial court found, H.B. 1316 merely requires Arapahoe County officials to execute financial documents which make bond proceeds available to the E–470 Public Highway Authority. Arapahoe County has no liability from its general funds for the repayment of the bonds, and it is not entitled to any of the revenues raised for the E–470 Public Highway Authority. Accordingly, H.B. 1316 does not violate Colo. Const. art. V, § 38.

The portion of the judgment in which the trial court found that the E–470 Public High-

way Authority is a district is reversed; the remainder of the judgment is affirmed.

PLANK and MARQUEZ, JJ., concur.