Honorable C. Thomas Blickensderfer State Senator State Capitol Building Denver, Colorado 80203
Dear Senator Blickensderfer:
This responds to your November 18, 1991 letter requesting this office examine the legal sufficiency of the Memorandum of Lease ("MOL") between the Denver Metropolitan Major League Baseball Stadium District ("District") and the Colorado Baseball Partnership in 1993, Ltd., a Colorado Limited Partnership ("Partnership"). As we discuss below, setting aside public policy and business judgment concerns, we have concluded a court would find that the arrangement entered into between the District and the Partnership does not violate Colorado law. It must be emphasized that we were not parties to previous lease negotiations and are not in a position to critique each and every judgment call that took place. Moreover, this opinion has not taken into account legislation that has been proposed to the 1992 General Assembly concerning the District. Finally, we recognize that the MOL is a preliminary agreement and that the parties still must address numerous issues in final negotiations.
While we have attempted to fully answer your questions, we must caution you that our inquiry was based upon facts which my staff was able to obtain without benefit of formal witness or document subpoena powers. The inquiry is necessarily limited to what we have been provided through the voluntary cooperation of the District, the Partnership, and others. The parties to the MOL have been fully cooperative recognizing the inherent limitations of an ongoing negotiation for the completion of a multi-million dollar transaction.
As you know, the legislation creating the District (§§32-14-101, et seq. C.R.S. (1991 Supp.)) gives the board of directors broad powers to lure baseball to Denver and to construct a baseball facility. Decisions made by the District within its legal authority are a matter of business judgment and our review does not address the wisdom of those policy choices. These choices can be evaluated by you and the public in other, more appropriate forums. Suffice it to say that reasonable people can differ as to the policy tradeoffs made by the District in its lease negotiations. Frankly, in retrospect, we might have made different policy decisions regarding allocation of stadium revenues. However, at the time the MOL was made the District was engaged in a highly public and multicity competition to attract major league baseball to this area. The lease negotiations occurred at a time when Colorado's success was uncertain, even doubtful. It is in that context the Board made most of the policy decisions reflected in the MOL.
Within this framework for our review, we have concluded that a court would likely find the MOL does not violate statutory or constitutional provisions. This is not to say nothing remains to be done in the final lease negotiations. We have simply concluded that a court would find the MOL is presently a binding and enforceable contract as to the issues raised and discussed herein. Our review also makes clear that the lease negotiations raise important fundamental policy issues beyond the scope of this opinion concerning the operation and accountability of public boards such as the District, especially when such entities have significant responsibilities to levy and spend tax revenues.
QUESTIONS PRESENTED AND CONCLUSIONS
1. Is the MOL legally binding and enforceable in its current form, as to both procedural regularity by the District and contractual validity?
Yes.
2. Are any of the issues addressed in the MOL severable from it without making the agreement voidable?
No, but the parties may agree to alter the MOL.
3. Were there any unlawful conflicts of interests among the District's Board of Directors during the negotiation and adoption of the MOL, pursuant to § 32-14-108, C.R.S. (1991 Supp.)?
 Evidence we reviewed disclosed an apparent conflict of interest by one member of the Board (Mr. Roger Kinney), but the conflict did not taint the validity of MOL negotiation.
4. Does the failure of the MOL to discuss capital improvements violate the Denver Metropolitan Major League Baseball Stadium District Act, §§ 32-14-101 to 32-14-133, C.R.S. (1991 Supp.) ("Act")?
No.
5. Does the MOL violate the Act by allowing the Partnership to operate and manage the stadium without competitive selection for an independent professional management organization?
No.
6. Is the sales tax election voidable on the ground that the wording of the ballot question is misleading?
No.
7. Does the MOL violate the Colorado Constitution by permitting either an unlawful donation of public funds or an improper commingling of public and private funds.
No.
ANALYSIS
I. Contract Analysis
A. Binding Contract
Colorado law is well settled that a preliminary lease, even where a subsequent formal document is anticipated, is a binding contract between the parties so long as it encompasses certain essential terms.
 Under the authorities, to create a valid contract of lease but few points of mutual agreement are necessary. First, there must be a definite agreement as to the extent and bounds of the property leased; second, a definite and agreed term; and, third, a definite and agreed price of rental, and the time and manner of payment.
Carlson v. Bain, 116 Colo. 526, 182 P.2d 909 (Colo. 1947). See also Cook v. Hargis,164 Colo. 368, 435 P.2d 385 (1967) (letter from tenant to landlord setting forth these essential terms was adequate as a lease agreement).
In this instance, it is clear that these essential elements are satisfied by the MOL dated March 14, 1991 (the MOL is attached as Exhibit A). First, no question exists regarding the facility to be leased to the Partnership. Second, the term is 17 years. Third, rent, in addition to the Partnership's agreement to pay all operation and maintenance ("O M") costs, is payable by the Partnership pursuant to a definitive calculable formula. Fourth, rent is due and payable pursuant to paragraphs 2(a), 2(b) and 2(e) of the MOL.
The interim character of the MOL, in that the parties intend to execute a formal lease agreement incorporating the MOL terms and other items at a later date, does not change the fact that a court would likely find the MOL remains a binding contract until a novation occurs by the final lease agreement.
 Two rules on this subject are well established: first, if the parties intend not to be bound until they have executed a formal document embodying their agreement, they will not be bound until then; and, second, the mere fact that the parties contemplate memorializing their agreement in a formal document does not prevent their informal agreement from taking effect prior to that event.
Ellis Canning Co. v. Bernstein, 348 F. Supp. 1212, 1222
(D. Colo. 1972).
Here, the District and the Partnership intended to be bound. They not only contemplated a formal document in the future, they also explicitly agreed that the ". . . memorandum reflects the basic business deal between the parties and is intended to be binding on the parties, their respective successors and assigns." (Page 6, paragraph 8 of the MOL terms.) However, it must be kept in mind that the District and the Partnership are always free to negotiate an entirely new lease agreement.
Finally, the following contractual elements must also be satisfied in order for the MOL to be binding: There must be mutuality of assent, consideration, and the statute of frauds must be complied with.
The mutuality of assent criteria is satisfied by the District's and Partnership's signatures appearing on page 7 of the MOL. The chairman of the Stadium District Board was authorized to execute the MOL terms on behalf of the District pursuant to §32-14-107, C.R.S. (1991 Supp.); Article II, Section 4 of the District's Bylaws; and, Resolution No. 91-16 of the District (approved by a vote of 4-0 at a District Board meeting on March 13, 1991).
With respect to the Partnership, a review of Colorado corporate law and documents provided by the Partnership clearly shows that the signature of Steven Ehrhart as president of Colorado Baseball 1993, Inc., the corporate general partner, binds the Partnership to the MOL terms. Colorado Baseball 1993, Inc. was incorporated on September 13, 1990, with Steven Ehrhart duly elected as president. On January 25, 1991, Colorado Baseball 1993, Inc. entered into a limited partnership association known as Colorado Baseball Partnership 1993, Ltd., as general partner. The general partner of Colorado Baseball Partnership 1993, Ltd. is given broad management authority pursuant to the terms of the limited partnership agreement. This management authority includes, but is not necessarily limited to, the authority to enter into binding contractual arrangements on behalf of the Partnership.
Consideration is in the form of mutual promises. While the Partnership has made a commitment to play in the stadium for 17 years, to pay all O M costs, and to pay additional rent, the District has agreed to lease the stadium exclusively to the Partnership for that term of years. Moreover, the Partnership has agreed at paragraph 2(b) of the MOL to reimburse the District for day-to-day operating costs in the administration of the District in an amount not to exceed $150,000 per year.
In Micheli v. Taylor, 159 P.2d 912, 913 (Colo. 1945), the Colorado Supreme Court addressed the issue of the statute of frauds as it relates to a memorandum for the purchase of property. The Court held:
 [T]he memorandum to comply with the statute [of frauds], "must show on its face, or by reference to other writings, first, the names of the parties, vendor and vendee; second, the terms and conditions of the contract; third, the interest or property affected; and, fourth, the consideration to be paid therefore," and further, "if the names and intention of the contracting parties can be determined with reasonable certainty from the language of the instrument, and a valid contract is thereby disclosed, specific performance may be decreed thereon."
See also § 38-10-108, C.R.S. (1982). The MOL satisfies the requirements of Micheli v. Taylor,supra, and § 38-10-108, C.R.S. (1982).
B. Severability
You have asked whether any particular issues in the MOL can be altered or removed while leaving the remainder intact and enforceable. In order for a contract to be divisible in the absence of a specific severability clause, it must be apparent from the agreement itself that the parties have assented separately to successive divisions, upon the performance of which the other party will be bound. L.U. Cattle Co. v.Wilson, 714 P.2d 1344 (Colo.App. 1986). The primary objective is to ascertain the intent of the parties as manifested by the terms of the agreement and the surrounding circumstances before any dispute arises. John v. UnitedAdvertising, Inc., 439 P.2d 53 (Colo. 1968). Among the circumstances to be considered is the apportionability of the consideration to the contract. Id. Finally, one should consider:
 [W]hether the parties assented to all promises as a single whole, so that there would have been no bargain whatever, if any promise or set of promises were struck out.
Id at p. 56.
In this instance, we believe a court would hold that the essential terms of the MOL are not severable. Even though the MOL covers a multitude of different topics, the entire agreement appears on its face to have been negotiated as a single whole, with a single purpose. There exist no:
 [S]uccessive divisions upon performance of which the other party becomes bound, or categories with such identifiable lines of demarcation that it becomes apparent the parties assented to several things.
Prospero Associates v. Burroughs Corp., 714 F.2d 1022
(10th Cir. 1983).
Articulation of general rules is difficult, however, because the ultimate result depends upon what the precise issue in dispute is and how that particular issue fits into the intent of the parties in the agreement as a whole. 3 A Corbin On Contracts
§§ 694-699 (1951 1991 Supp.). Every matter addressed in the MOL appears to be part of the core financial bargain reached by the parties. There are, however, many issues which are either not discussed (e.g., capital improvements) or are left to final lease negotiations. The parties expressed their intent on this subject as follows:
 8. Binding Effect and Enforceability. (a) Although the Partnership recognizes that the Partnership's use and enjoyment of the Stadium will be subject to the terms of a definitive lease agreement which will encompass issues not addressed in this Memorandum, the parties agree that the terms set forth herein will be incorporated into the Lease and that this Memorandum reflects the basic business deal between the parties and is intended to be binding on the parties, their respective successors and assigns.
Based upon the parties' expressed intent, neither side can simply abandon or materially alter the MOL without consequence. Of course, the MOL as a whole can be renegotiated if the parties wish to alter or amend the essential contract terms.
II. Procedural Matters
A. Chronology of Negotiations
Our review of District and Partnership documents, and our Board member interviews, show that up to March 13, 1991 Board members took an active role in negotiating the MOL terms with the Partnership (see, e.g., Exhibit B). Following is a brief chronology regarding the negotiation process leading up to the final MOL terms executed on March 14, 1991.
 a. July 1990 Plan of Finance envisioning franchise holder as stadium operator.
 b. November 15, 1990 — letter from John McHale to the Partnership re: preliminary lease negotiations.
 c. January 27, 1991 — letter from Paul Jacobs to Debra Brody re: preliminary lease negotiations and outline of certain terms which the Partnership deems essential including designating the Partnership as the "developer" of the stadium; term of lease; control of stadium; designation of the Partnership as "operator"; control by the Partnership of all revenue streams; revenue sharing; and, rights of first refusal and options to purchase.
 d. January 24, 1991 — letter from Debra Brody to Paul Jacobs in response to correspondence of January 17, 1991. Enclosed was a first draft of the MOL which states that its terms are not binding.
 e. March 1, 1991 — letter from Steven Ehrhart by Paul Jacobs to Debra Brody in response to correspondence and first Draft of MOL dated January 24, 1991. Raises several issues regarding first Draft provisions including the intended binding effect of the MOL terms; collaborative mechanism for the development and construction of the stadium; control of the stadium; profit sharing on sale of the stadium; and, a baseball community trust.
 f. March 11, 1991 — second Draft of MOL terms from Debra Brody to Paul Jacobs in response to correspondence dated March 1, 1991 from Steven Ehrhart.
 g. March 12, 1991 — third Draft of MOL terms from Paul Jacobs to Debra Brody in response to second Draft dated March 11, 1991.
(See Exhibit B). Negotiations on the MOL terms took place during the period of November 15, 1990 until its final execution on March 14, 1991. These writings also indicate that significant face to face negotiations also took place over a period of time preceding and during the period of time between November 15, 1990 and March 14, 1991.
No less than three drafts of the MOL had been created before its formal execution on March 14, 1991. The first and second drafts were provided by board member Debra Brody and the District on January 24, 1991 and March 12, 1991 to the Partnership.
B. Voting
Pursuant to § 32-14-106(8), C.R.S. (1991 Supp.), "Board action shall require the affirmative vote of a majority of the total membership of the Board." This language is consistent with the District's Bylaws at Article I, Sections 4 and 5.
Section 4 establishes a quorum as a majority of the total number of directors, or four out of seven. Section 5 states that Board action requires the affirmative vote of a majority of the Board's membership, again, four out of seven.
On March 13, 1991, the day before the MOL was executed, the District's minutes indicate that the Board voted 4-0 to pass Resolution No. 91-16. Resolution No. 91-16 states that:
 Pursuant to sections 125 and 126 of Article 14, Title 32, C.R.S., the chairman of the Board, John McHale, is authorized to negotiate and execute the MOL terms with the Partnership regarding the outline of terms for lease of the stadium based upon the Board's instructions provided at the meeting.
Resolution No. 91-16 simply granted McHale the authority to iron out the final terms of the last draft and execute it, all in accordance with the instructions provided by the Board.
On April 3, 1991, at a regular meeting of the District Board, the Board passed Resolution No. 91-17 by a vote of 5 to 0. Board member Baker was absent from the vote, and Board member Kinney had resigned from the Board in mid-March 1991, prior to the Board's action on Resolution No. 91-17. Resolution No. 91-17 approved and ratified the MOL terms executed on March 14, 1991.
Thus, Board actions directly related to execution of the MOL (Resolutions 91-16 and 91-17) were taken by a proper majority. From our information, nothing about the Board's actions between March 13, 1991 and April 3, 1991 is inconsistent with the Act.
C. Bylaws
The District's Bylaws have been compared, clause by clause, with the Act. No inconsistencies exist. Some provisions of the Bylaws are not addressed or provided for by the legislation (i.e., powers and duties of board officers). However, those provisions of the Bylaws are consistent with general corporate law.See § 7-5-115, C.R.S. (1986 Repl. Vol 16A).
D. Open Meetings
A question has been raised as to whether the District complied with the legal requirements for open meetings in approving the MOL. Until June 1, 1991, all political subdivisions of this state, including the District, were subject to § 29-9-101, C.R.S. (1986), the so-called "Public Meetings Law." See
§ 32-14-106(7), C.R.S. (1990 Supp.); 1991 Colo. Sess. Laws 821. In 1991, the General Assembly repealed the Public Meetings Law and subjected all political subdivisions of this state to the open meetings provisions of the "Colorado Sunshine Law," §§24-6-401 to 24-6-402, C.R.S. (1991 Supp.). Colo. Sess. Laws 815-822 (hereinafter SB 91-33). Prior to June 1, 1991, only state agencies were subject to the Sunshine Law. The District statute referencing the Public Meetings Law was also expressly amended by SB 91-33 to reference the Sunshine Law. 1991 Colo. Sess. Laws 821. Therefore, actions taken by the District prior to June 1, 1991 were clearly subject to the Public Meetings Law and not the Sunshine Law.
As stated above, documentation presented to this office by the District and others establishes that the MOL was negotiated between November 1990 and March 1991, with formal approval of the MOL by the Board occurring on April 3, 1991. The Public Meetings Law therefore governs District action related to negotiation and execution of the MOL.
Prior to its repeal, the Public Meetings Law, § 29-9-101, stated as follows:
 29-9-101. Public meetings. (1) All meetings of any board, commission, committee, or authority of a political subdivision of the state supported by law in its activities in whole or in part with public funds are declared to be public meetings and open to the public at all times; but such groups, by majority consent of members present, may go into executive session for consideration of documents or testimony given in confidence but shall not make final policy decisions, nor shall any resolution, rule, ordinance, regulation, or formal action or any action approving a contract or calling for the payment of money be adopted or approved at any session which is closed to the general public.
 (2) Any action taken contrary to the provisions of subsection (1) of this section shall be null and void and without force or effect.
 (3) Notwithstanding any provision of subsection (1) of this section, a board of education of a public school district and the governing body of any municipality, county, or special district may meet in executive session to determine its position relative to issues that may be subject to negotiation, to receive reports on negotiations progress and status, to develop strategy, and to instruct its negotiators.
The plain language of the statute provides that the District Board may meet in executive session, not open to the public, for the purpose of determining its negotiation posture relative to the MOL, but may only take formal action to adopt or approve the MOL at a meeting open to the public. This statute has been interpreted as requiring public notice of meetings and free access by the public to such meetings. Allen v. Board ofCounty Commissioners, 178 Colo. 354, 497 P.2d 1026
(1972). The requirement of public notice may be satisfied by formally establishing and adhering to a regular meeting schedule.Allen, 497 P.2d at 1028. Whether or not a meeting is truly closed requires a showing that the public entity intended to exclude the public and that someone desiring access was, in fact, excluded. Id. The adequacy of notice and whether or not the meetings were lawfully open is discussed below.
The District statutes provide that the Board is empowered "to fix the time and place at which its regular and special meetings shall be held within the geographical boundaries of the district." Section 32-14-107(1)(a), C.R.S. (1991 Supp.). Pursuant to its power in § 32-14-107(1)(b), C.R.S. (1991 Supp.) to adopt rules of procedure and bylaws, the Board specified the first Wednesday of every calendar month, at 8 a.m., at the District's offices, as the time and place for regular Board meetings. See Bylaws, amended December 5, 1990, § 3; see also Resolution 90-77, dated December 19, 1990 and Minutes of December 19, 1990 Board Meeting, Agenda Item 4. Section 4 of the referenced Bylaws provides that special meetings of the Board may be called by the Chairman or by a majority vote of all Board members "upon at least 24 hours notice to theDenver Post and the Rocky Mountain News, and to any other person requesting notice of such meetings." (Emphasis in original.) Any regular or special meeting may be continued by action of the Board in open session. See
Bylaws, § 8. The bylaws, minutes, and resolutions of the Board have been recorded and appear to be open to public inspection as required by § 32-14-109(1), C.R.S. (1991 Supp.). These documents were provided by the District immediately upon request by this office.
Once again, the documentation makes clear the Board took its final actions on the MOL on March 13, 1991 and April 3, 1991. The minutes of the March 13, 1991 meeting, expressly provide that they are a continuation of the regular meeting on Wednesday, March 6, 1991. The March 6, 1991 Minutes and Resolution 91-12 state that the entire Board, in open session, voted to continue the March 6, 1991 regular meeting on March 13, 1991 at 8 a.m. at the District's offices. The Minutes of March 13, 1991 indicate that certain individuals interested in the stadium site selection were present for that purpose and made comments pertinent to that issue. The April 3, 1991 meeting occurred on the first Wednesday in April at 8 a.m. and was presumptively a regular meeting pursuant to the Bylaws and Resolution 90-77.
From the information presently available to us, the March 13, 1991 and April 3, 1991 meetings were held pursuant to adequate notice. The meetings appear to have been held pursuant to a properly established procedure. These procedures and the actual occurrence of meetings appear to have been discoverable upon reasonable inquiry by any member of the public.
We have not been provided with any evidence of intent to exclude, nor of any actual exclusion, from open meetings. Without more, we cannot conclude that these meetings were closed to the public.Allen, 497 P.2d at 1028. In fact, the information presently available to us and described above indicates that at least one of these meetings (March 13, 1991) was attended by several members of the public. Since this was a continuation and not a regular meeting, it appears the Board's means of communicating notice was effective.
Finally, we note that the District's formal action in open session pertaining to the MOL, which consisted only of voting to approve certain courses of action, is entirely consistent with the law in effect at that time. The plain language of §29-9-101(1) requires final action in open session. In the case ofLittleton Education Association v. Arapahoe County SchoolDistrict, 186 Colo. 428, 528 P.2d 1299 (1976), the Colorado Supreme Court found a collective bargaining agreement to be void because the School Board met in executive session to discuss negotiating strategy and then went on the record in open session solely to take votes. When the case was decided in August of 1976, subsection (3) of § 29-1-101 did not exist. The General Assembly amended the law less than one year later to permit negotiation in executive session; § 29-1-101(3) was added to the law apparently in direct response to the Littleton
case. 1977 Colo. Sess. Laws 1155.
Based upon the facts presently known to us and in recognition of the General Assembly's clear intent to permit sensitive negotiation discussions in executive session, this office is unable to conclude the Public Meetings Law has been violated with regard to the MOL. There are no facts presently known to us which dictate a different result. The degree of disclosure required of a public body under § 29-9-101 when returning to an open meeting from executive session held for contract negotiation purposes cannot be defined absent a specific context of alleged injury presented in an appropriate judicial forum.
III. Conflicts of Interest
Two former members of the District Board of Directors, John McHale, former Board Chairman, and Roger Kinney, are now employed by the Partnership. This has raised considerable concern about conflicting interests that may have occurred during the lease negotiations. We are disturbed by the appearance of a conflict created in these situations and they surely have undermined public confidence in the District's efforts to bring baseball to Denver and to build a baseball-only stadium. Nonetheless, we did not uncover evidence that either person illegally abused his District position in negotiating the MOL.
The legislation creating the District prohibits conflicts of interest on the part of members of its board of directors, stating:
 No director, employee, or agent of the district shall be interested in any contract or transaction with the district except in his official representative capacity.
Section 32-14-108, C.R.S. (1991 Supp.). The statutory language fails, however, to specify any penalty for a breach of this provision, nor does it further define what is a prohibited interest in a contract.
An analogous prohibition is set out in the standards of conduct promulgated by the legislature for public officials and employees in article 18 of title 24, C.R.S. Included there is a proscription that public officers "shall not be interested in any contract made by them in their official capacity. . . ." Section24-18-201, C.R.S. (1988). Contracts made in violation of that prohibition are "voidable at the instance of any party to the contract except the officer interested therein." Section24-18-203, C.R.S. (1988). That statute further specifies that holding a minority interest in a corporation is not a sufficient interest to justify voiding a contract. Section 24-18-201(1)(a), C.R.S. (1988). As an ethical consideration, a public officer or local government official is urged not to acquire an interest in any business which he has reason to believe may be benefited economically by official action over which he has substantive authority, not to obtain employment within 6 months of the termination of his office, in which he will take direct advantage of matters with which he was directly involved during his term. But actions contrary to those ethical principles are not violations of the public trust. Section 24-18-105, C.R.S. (1988).
The requirements of article 18 of title 24 were applicable to the directors of the District during the period of the negotiation through final execution of the MOL on March 14, 1991. Effective March 29, 1991, the General Assembly amended the definition of a "public officer" subject to those standards so as to exclude any local government official or any board member "who receives no compensation other than a per diem allowance or necessary and reasonable expenses." Section 24-18-102(8), C.R.S. (1991 Supp.). Since the District directors receive no compensation other than reimbursement for their expenses, they now are excluded from coverage of the requirements of the standards of conduct applicable to other public officers, local government officials and employees. See § 32-14-106(9), C.R.S. (1991 Supp.).
Even in the absence of a specific statutory prohibition, Colorado courts have held that "public policy forbids public officers from contracting with themselves for their own benefit." BerkeleyMetropolitan Dist. v. Poland, 705 P.2d 1004 (Colo.App. 1985) (board member of special district held liable to repay moneys he received as a paid consultant to the board over 10 years even though he did not participate in the vote by other board members to contract with him). See alsoPeople ex rel. Commissioners v. Brown,93 Colo. 182, 24 P.2d 759 (1933); School Dist. No. 98 v.Pomponi, 79 Colo. 658, 247 P. 1056 (1926) (contract between a school district and members of its board was void or voidable as against public policy, irrespective of any statute). Those cases concluded that the suspect contracts were voidable and that the public officials who engaged in self-dealing were liable to repay any moneys they were paid under the contracts.
If a member of the District board of directors had a substantial personal interest in the MOL when it was approved, our opinion is that the contract would be voidable at the election of the current Stadium District Board. But no information has been brought to our attention that would establish such a direct personal interest in the MOL on the part of any District director.
One director, Roger Kinney, apparently provided services to the Partnership while he served on the District Board commencing in mid-January 1991. Mr. Kinney was originally a member of the Baseball Commission created by § 32-14-131, C.R.S. (1991 Supp.), and was later appointed to the Board, based upon his expertise in community support and relations. Beginning in December of 1990, Mr. Kinney assisted both the Board and the Partnership making preparations for the site visit by National League officials. He was reimbursed for out-of-pocket expenses for that activity by the Partnership between January 1991 and March 14, 1991, when he officially resigned his position on the Board (see Exhibit E). Mr. Kinney, the Board, and the Partnership believed the goal of a successful site visit was common to both the District and the Partnership, and that Mr. Kinney's success in organizing the college basketball "Final Four" (1990) at McNichols Arena made him the appropriate choice for organizing the National League's visit.
Concerns about Mr. Kinney's conflict of interest were expressed and discussed at the time (January 1991) by both sides. The Board was aware of Mr. Kinney's dual role and we are informed by Mr. Kinney and others that he discontinued his role as Board member as to MOL negotiation, but continued to serve the District with his expertise in the site selection process. The minutes of Board meetings from January 9, 1991 to April 3, 1991 reveal that Mr. Kinney was present at Board meetings during this time, except the April 3, 1991 meeting at which the executed MOL was ratified. The minutes also indicate that Mr. Kinney did not vote on the MOL at either the March 13, 1991 or April 3, 1991 meetings. Further, there is no indication in any of the minutes that Mr. Kinney was present during MOL negotiations. In an interview with Mr. Kinney he flatly stated that he did not participate in substantive lease negotiations or submit confidential Board information or strategy to the Partnership while consulting on site selection. Seealso Exhibit E. Other interviews with lease negotiators confirm these representations.
Mr. Kinney formally resigned from the Board on March 14, 1991. Yet the minutes reflect neither tender nor acceptance of Mr. Kinney's formal resignation. Exhibit E is the only document we have been provided establishing the date as March 14, 1991. From March 15, 1991 through September 1991, he was apparently a paid consultant to the Partnership for maintaining favorable relations with the National League up to and beyond the award of a franchise to Colorado. Since October 1991, Mr. Kinney has been employed by the Partnership as its Director of Community Relations (Exhibit E).
We believe this dual role by Mr. Kinney between January and mid-March 1991 was improper under the circumstances, and constituted an apparent conflict of interest. The mere access to information on both sides is enough to warrant public concern. However, because we found no evidence indicating that Mr. Kinney actually used his position to improperly influence or direct lease negotiations, we cannot conclude that this conflict affected the confidentiality of Board negotiations on the MOL.
A second director, John McHale, is now employed by the Partnership in a top management position after actively participating in the negotiation and approval of the MOL during his service on the District board. However, the evidence we have reviewed indicates that the Partnership approached Mr. McHale regarding employment after award of a franchise, and that Mr. McHale officially resigned as District Board memberprior to negotiating and accepting such employment. No contrary information has been developed during our review.
Based upon these facts, there is no evidence of unlawful self-dealing on the part of Mr. Kinney or Mr. McHale that would enable the Board to void the MOL. Mr. Kinney's simultaneous role as a consultant to the Partnership and District Board member on site selection creates an apparent, if not illegal, conflict of interest, as well as a clear appearance of impropriety. If either Mr. Kinney or Mr. McHale had been an "employee" of the District, the statutory standards of conduct would have prohibited them from seeking employment with the Rockies for 6 months after leaving the District. See § 24-18-201(1), C.R.S. (1988). No comparable restriction applied to District directors, however.
Given the nature of the allegations raised here, the General Assembly could consider enlarging the conflict of interest provisions of the Act to include at least a six or twelve month non-employment provision for Board members.
IV. Capital Improvements
The MOL provides at § 2(a), page 3, that the Partnership will pay, as rent, "all costs of operation and maintenance of the Stadium." This obligation is further discussed in § 2(c), page 4, which states as follows:
 (c) The Partnership shall be obligated to: (i) maintain the Stadium in a first-class manner comparable to the other major league baseball facilities and (ii) to pay only the costs of operation and maintenance of the Stadium.
The MOL nowhere uses the terms "capital improvements" or "repairs," leaving open to question what, if anything, the parties agreed to regarding future capital costs. By the term capital costs, we refer generally to items which are depreciable for tax purposes as capital expenditures. By way of example only, such costs might include future facility enhancements or expansion, expected or unexpected major mechanical system or fixture replacement (excluding consumable items or parts necessary to equipment operation and which require periodic replacement), and unanticipated structural repairs.
To determine whether the MOL lawfully allocates such costs, the statutory language must be considered. Section 32-14-115, C.R.S. (1991 Supp.) provides that the sales tax revenues may be used to build a stadium, pay off the bonds issued to raise the construction funds, and to defray the District administrative expenses. Section 32-14-116(1), C.R.S. (1991 Supp.) plainly requires that major league baseball pay its own way by using operating revenues to pay the costs of "general operation," "repair and maintenance," and "capital improvements." Therefore, the MOL can only be construed to mean that the capital cost obligations follow the operating revenues. The District may lawfully pay for capital costs obligations it may have only from its share of operating revenues, if any. The reality is that the Partnership is obligated to pay all costs of playing baseball in the Stadium which are in excess of the District's share of operating revenues. If the District has no lawfully available funds and the cost is not paid by the Partnership in such event, the work simply does not get done. Bear in mind, however, that article 3, "TERM," of the MOL clearly requires the Partnership to play its home games in the Stadium for 17 years. A failure to do so as a result of willful failure by the Partnership to pay a cost which the District legally cannot pay could constitute a breach of the MOL.
The remaining question is, to the extent the District has operating revenues from "lease payments, fees, rentals, rates, tolls, penalties, charges for services, programs, or facilities furnished by the District," what capital costs must the District pay under the existing MOL language. See §32-14-116(1), C.R.S. (1991 Supp.). In our view, it is premature to undertake a lengthy analysis of the case law and attempt to judge the transaction on this issue prior to completion of the negotiations. Since the District has not agreed to pay any of the costs described in § 32-14-116(1), the MOL does not violate the Act in this regard. The statutory mandate and the above-referenced ambiguity are, however, more than adequate reasons for the parties to address this issue in the final written expression of their agreement. It appears from our review the parties were intentionally silent on this issue, pending final contract negotiations. In short, the MOL does not presently violate the law as to capital improvements and it seems prudent to simply let the parties complete the transaction as to that issue. The final agreement should define capital improvements and address how operating revenues will be set aside to meet contingencies.
V. Partnership Management And Operation Of The Stadium
The District awarded operation and management of the stadium to the Partnership as part of the MOL. From the outset, it is critical to note that the District's 1990 Plan of Finance envisioned that the franchise owner would also be the manager and operator of the stadium (see Exhibit C). A chronology of significant events has been prepared by the District and is attached as Exhibit D. This Plan of Finance was formulated long before the present ownership group was formed in August of 1991. Moreover, the Act itself contemplates privatization efforts involving lease agreements for stadium operation and management. Section 32-14-110, C.R.S. (1991 Supp.) and § 32-14-125, C.R.S. (1991 Supp.).
We have concluded that the MOL, in its present form, is not in violation of the competitive selection requirements of Section32-14-124, C.R.S. (1991 Supp), nor with the timing, professional qualifications, and contract enforcement standards in Section32-14-125, C.R.S. (1991 Supp.). Several items, however, remain to be addressed in the final agreement.
A. Competitive Selection
The MOL provides that the Partnership will assume all costs to operate, manage, and maintain the stadium for 17 years from event and other revenues, and will not look to the District (and the taxpayers) for further contributions in this regard. In consideration of this risk, the District has assigned its right to receive such such operating revenues to the Partnership. The Partnership is therefore both lessee and operator-manager of the stadium. The MOL is silent on the issue of service and supply contracts necessary to run the stadium, but it appears the parties implicitly intended that the Partnership's assumption of all costs includes the right to control expenditures of that nature. In effect, the MOL contemplates the Partnership acting as a general contractor for operations, with power to retain necessary subcontractors. Thus, the question of MOL compliance with the Act relative to competitive contracting raises two distinct issues for legal analysis.
The first is whether the contract bidding statute applies to management agreements, and if so, was the operation and management portion of the MOL awarded on a "fair and competitive basis," consistent with the statute. Second, whether the right and power to award all of the service and supply contracts may be transferred to the Partnership as part of the MOL bargain. The analysis first addresses the MOL's consolidation of the lease and the management agreement in a single contract without competitive selection for the operator, and then discusses the selection of vendors for all services and supplies necessary to operate the stadium.
1. Management Agreement
Analysis of the applicable statutes begins with the plain language of each. Colorado Common Cause v. Meyer,758 P.2d 153, 160 (Colo. 1988). Section 32-14-124, C.R.S. (1991 Supp.) states as follows:
 32-14-124. Contracts. The board shall award contracts in excess of three thousand dollars on a fair and competitive basis for the construction of any works, facility, or project, or portion thereof, or for the performance or furnishing of any labor, material, personal or real property, services, or supplies.
This statute is referred to as the "contracts statute." Section32-14-125, C.R.S. (1991 Supp.) states as follows:
 32-14-125. Management agreement — operation of stadium. Upon the approval of the registered electors pursuant to the provisions of section 32-14-105 and upon the granting of a major league baseball franchise by major league baseball to be located within the district, the board shall negotiate and enter into one or more management agreements for the management and operation of the stadium with independent contractors upon such terms and conditions which the board deems reasonable and necessary. Such agreements shall be legally binding contracts between the district and professional management organizations which shall contain appropriate and reasonable provisions with respect to termination, default, and legal remedies. For purposes of this section, "professional management organization" means a person, firm, or corporation having experience, expertise, and specialization in the management and operation of sports, entertainment, or convention facilities, or in a particular area therein.
(emphasis added). This statute is referred to as the "management statute." Section 32-14-126, C.R.S. (1991 Supp.), states as follows:
 32-14-126. Lease of stadium — major league baseball franchise. (1) Any lease agreement entered into by the district and the major league baseball franchise to be located in the district shall include, but is not limited to, the following:
 (a) A provision requiring the major league baseball franchise to conduct its complete regular home season schedule and any home play-off events in the stadium;
 (b) A provision requiring the major league baseball franchise to advertise and promote events it conducts at the stadium; and
 (c) A provision requiring the major league baseball franchise to not unreasonably withhold permission for the holding of other events in the stadium.
This statute is referred to as the "lease statute."
The District statutes do not expressly preclude the inclusion of operation and management terms as part of the MOL consideration. The use of common terminology and overlapping concepts certainly gives rise to the question of whether or not operation and management of the stadium must be competitively selected. For example, the contracts statute uses the terms "contracts" and "services." The management statute also uses the term "contracts," and both management and operation of the stadium are clearly services. Yet the management statute uses the term "agreements" when specifically referring to operation and management contracts. The term "contracts" in that statute is used in a generic sense in the context of requiring an arm's length relationship between the District and the operator ("Such agreements shall be legally binding contracts. . . .").
It is presumed that in providing by separate statute for the negotiation and execution of operation and management agreements the General Assembly intended something different than what is stated in the contracts statute. See McMillin v.Colorado, 158 Colo. 183, 188, 405 P.2d 672, 674 (1965). "Management agreements" are set out in § 32-14-125 as distinct types of service contracts, for which the District is instructed to "negotiate and enter into one or more" of. The instruction to "negotiate" and execute management agreements expresses something quite specific and different from the general requirement in the contracts statute to award contracts on a "fair and competitive basis."
If the stadium lessee is properly qualified, nothing in the Act expressly precludes the lessee from also being the operator. The management statute states that the District is to make management agreements "upon such terms and conditions which the board deems reasonable and necessary." Section 32-14-125. This sweeping discretion can hardly be read as precluding the Board from combining the real property lease and the management agreement into a single, interrelated contract without competitive selection. Further, the minimum stadium lease requirements in § 32-14-126 have been met by the MOL and nothing in that statute precludes management by the franchise holder. Indeed, the District concluded early in its planning that it would be desirable policy to choose the franchise holder as the Stadium operator. That way the operator would have the greatest possible financial incentive to provide outstanding service at the facility for the persons attending stadium events.
The fact that management agreements and leases are discussed in separate sections is, in our view, nothing more than a logical organizational distinction in drafting minimum legal requirements on two distinct subjects. This is not a clear command to keep the agreements separate. The plain language of the lease statute states that stadium lease "shall include, but is not limitedto," the three matters described therein. Section32-14-126(1) (emphasis added). Even if there is a general presumption that a separate statute regarding the lease indicates the General Assembly envisioned two district agreements, such presumption is overcome by the express language of the lease and management statutes and by the Board's powers and duties, discussed below.
What is certain from a reading of these statutes is that none of them plainly answers the question of naming the baseball franchisee as operator without competition. The primary goal in all statutory construction is to determine and effectuate the legislative intent. Meyer, 758 P.2d at 160 (Colo. 1988). Since the legislative intent as to competitive selection is not entirely clear on the face of the contracts and management statutes, an examination of the entire legislative scheme is necessary. See State Highway Commission of Colorado v.Haase, 189 Colo. 69, 75, 537 P.2d 300, 305 (1975). In attempting to determine the legislative intent as to inclusion of stadium management in the real property lease without competitive selection, it is appropriate to consider the legislative history, the consequences of particular constructions, and the object sought to be attained by the General Assembly. Section2-4-203(1), C.R.S. (1980); Meyer, 758 P.2d at 160.
The legislative scheme of which these statutes are a part gives the District very broad powers to bring major league baseball to Denver. The legislative declaration of purpose at §32-14-102, C.R.S. (1991 Supp.) states as follows:
 32-14-102. Legislative declaration. The general assembly hereby finds, determines, and declares that the location of a major league baseball franchise in the state of Colorado would be a source of recreational entertainment for the residents of the state; that a major league baseball franchise would stimulate economic development throughout the state resulting in increased tourism, the creation and maintenance of new jobs, and the attraction and retention of sports and entertainment events; that, in order to be considered for the location of a major league baseball franchise, it is essential that the mechanism exist for financing and constructing a major league baseball stadium in the Denver metropolitan area; and that the creation of a major league baseball stadium district will promote the health, safety, and welfare of the residents of the state.
The overriding purpose of the Act is to lure baseball to Colorado within the financial constraints of the taxing authority. In creating and empowering the District to accomplish that purpose, § 32-14-107(1), in pertinent part, provides as follows:
 (1) In addition to any other powers specifically granted to the board in this article, the board shall have the following powers and duties:
. . . .
 (d) To promote the acquisition of a major league baseball franchise and the construction of a stadium within the district;
. . . .
 (h) To enter into such contracts as may be authorized in this article including, but not limited to, contracts for the lease and sale of a stadium;
 (i) To enter into and execute all contracts, leases, intergovernmental agreements, and other instruments in writing necessary or proper to the accomplishment of the purposes of this article, including, but not limited to, intergovernmental agreements concerning revenue sharing;
. . . .
 (o) To exercise all powers necessary and requisite for the accomplishment of the purposes for which the district is organized and capable of being delegated by the general assembly; and no enumeration of particular powers granted shall be construed to impair any general grant of power contained in this article or to limit any such grant to powers of the same class as those so enumerated;
In subsections (1)(h) and (1)(i) of § 32-14-107, the terms "contracts," "leases," and "agreements" are used differently in each. In § 32-14-107(1)(h), "contracts" includes a lease of the stadium. Yet the language of the contracts statute cannot include leases; competitive selection of the real property lease would be absurd because there is only one baseball franchise. Section 32-14-107(1)(i) distinguishes between "contracts, leases, intergovernmental agreements, and other instruments in writing." An "intergovernmental agreement" is used as a distinct type of contract, just as "management agreements" is used distinctly in the management statute. Such usage is further indication that the General Assembly intended something other than competitive selection in § 32-14-125 in directing the District to "negotiate and enter into one or more management agreements." This view is supported by the fact that the term "intergovernmental agreements" was added to § 32-14-107(1)(i) by amendment. 1990 Colo. Sess. Laws 1519. This modification coincided with the creation of the revenue sharing statute at § 32-14-126.5, C.R.S. (1991 Supp.), requiring excess District revenues be fairly distributed among political subdivisions comprising the taxing District. 1990 Colo. Sess. Laws 1525. Significantly, the Board's prior power to "enter into and execute all contracts, leases, and other instruments in writing" was apparently deemed in need of a specific reference to "intergovernmental agreements." If the General Assembly determined that intergovernmental agreements were not covered by existing references to contracts and written instruments, it is inconsistent to read "management agreements" in § 32-14-125
as just another contract for competitive selection purposes; the term must be construed as having a meaning distinct from general references to "contracts."
The powers and duties statutes provide the Board the broadest of powers to do whatever is "necessary and requisite" to bring baseball to Denver. Section 32-14-107(1)(o). The language is not "necessary and proper," nor is it "necessary and reasonable." The statute directs and empowers the Board to do whatever isrequired to accomplish the overriding purpose of the Act, and restricts this unusually broad discretion only through limitations on spending authority and other specific direction on particular subjects. The Act precludes the acquisition of baseball at any price by placing certain financial constraints upon the District's broad discretionary powers. Sections32-14-115 and 32-14-116 distinguish tax revenues from operating revenues and draw a bright line beyond which the board may not go.
Considered in its entirety, the Act provides that the taxpayers will, if necessary, build a new stadium, but under no circumstances will they pay for the management and operation of the facility. Sections 32-14-110 and 32-14-116 set private contributions to the stadium construction as a desirable target, but the legislative history and the circumstances surrounding passage of the Act indicate the General Assembly understood that 100 percent public funding of the stadium might very well be necessary to attract private capital investment and the award of a franchise. Senate Finance Committee Hearing, House Bill 1341, March 14, 1989. (Lengthy recorded testimony discusses the very low probability of any private funds for stadium construction, based upon Denver's own experience and that of other cities across the country.) Section 32-14-110, the "privatization statute," directs the District board to "study, consider, and pursue opportunities for privatizing the costs of acquiring a stadium site, the costs of constructing a stadium, or the costs of operating a stadium in order to minimize the use of the sales tax revenues to the greatest extent possible for the purposes of this article." The fifty percent target for private contributions to stadium costs in § 32-14-113, C.R.S. (1991 Supp.) was aspirational and not mandatory. "Such amount constitutes a target which the district shall attempt to achieve but is not a mandatory requirement." Id.
Many have expressed disappointment that a higher level of private funding was not achieved. The Board maintains that, given Colorado's weak bargaining power as a relatively small baseball market, the best it could do without losing the heated competition for a team to better funded ownership groups was to agree to construct a stadium with public funds and to agree in principle to let the Partnership manage the facility. In exchange for this arrangement the Board obtained what it calls a "triple-net" lease, by which the taxpayers shift all of the operational risk for 17 years to the Partnership. The wisdom of the approach taken by the Board is not the subject of this inquiry. But we cannot conclude that the Act prohibits the basic business arrangement negotiated by the Board. Considering the purpose of the Act, its history, and the broad discretion given to the Board, it is unlikely a court would restrict the Board's general power to execute a lease naming the Partnership as operator of the stadium. So long as the Partnership otherwise qualifies under the management statute, the Board is so empowered.
With regard to naming the Partnership as operator without competitive selection, it is also instructive to note that the contracts statute was repealed and re-enacted in 1990. 1990 Colo. Sess. Laws 1524. In its original form, § 32-14-124, C.R.S. (1990 Supp.) stated as follows:
 32-14-124. Compliance with procurement procedures. All purchases, expenditures, and payments of the board shall be made in conformance with articles 101 to 112 of title 24, C.R.S.
The cross-referenced statutes are the Colorado Procurement Code (hereinafter the "Code"). Section 24-101-101, C.R.S. (1988). The change from strict compliance with the Code to the phrase, "fair and competitive basis," and the scope change from "all purchases, expenditures, and payments" to "contracts in excess of three thousand dollars," was clearly an attempt to ease the District's procedural burden, not make more difficult the accomplishment of its substantive mission. Even if "contracts" in § 32-14-124
includes "management agreements," under the Code, the Board could have relied upon § 24-103-201(1), C.R.S. (1988) ("unless otherwise authorized by law") to rationally argue that other aspects of the Act supersede competitive selection requirements for management agreements. In our view, this argument would be defensible, whether its thrust were that competitive selection of the operation and management would have defeated the legislative intent to bring baseball to Denver, or that the power to negotiate professional management agreements and a stadium lease are more specific statutory direction than the general competitive selection requirements. Further, the Board could have invoked other provisions of the Code pertaining to sole source procurements. See § 24-103-201(1)(c), C.R.S. (1988) and § 24-103-205, C.R.S. (1988). Finally, the District's policy decision to name the baseball franchise holder as the operator of the Stadium because of a belief that better customer service would be delivered meant that only one operator — the franchise holder — could meet District eligibility criteria. To require additional competition in those circumstances would have been pointless.
Earlier versions of the Act would not have precluded the Board from concluding that the party with the only Denver baseball franchise should be a sole source for operation and management of the stadium. Given the fact that the contracts statute was amended to make the District's task easier, it is unlikely that a court would find a legislative intent to preclude the District from making operation and management a part of the real property lease consideration without competition. Since the General Assembly removed specific bidding criteria and specified none in their place, the manner of awarding contracts may be decided by the Board. E. McQuillen, Municipal Corporations § 29.31 (3d ed. 1990). While it may have been a better policy for the Board to bid out the operations agreement, we cannot conclude that a court would find that MOL invalid on this basis.
2. Other Contracts
The foregoing analysis regarding the lease and the management agreement does not necessarily support award of operational service and supply contracts by the Partnership without competitive selection or ultimate approval by the Board. It is not entirely clear the management statute contemplates negotiation for an operator who is both a professional manager and a general contractor for supplies and services. The contracts statute is an express limitation upon the Board's otherwise broad powers, but does not clearly state whether it applies only to contracts to which the District is actually a party, or to any contract funded with District funds. Moreover, District funds may be only sales tax revenues and operating revenues actually received, or they may include funds the District has a right to receive but bargained away (e.g., rent, concession fees, etc.). The MOL requires the Partnership assume all operation and maintenance costs, which, the Board argues, necessarily makes all such contracts those of the Partnership and not the District. In essence, supply and service vendors become subcontractors controlled by the Partnership as part of its primary contract to operate and maintain the stadium. We have been informed that all District contracts to date utilizing tax revenues have been competitively bid, including the contract for legal services, and that the District intends to continue awarding all District-funded contracts in excess of $3,000 on that basis. This means all contracts for construction of the stadium will also be competitively bid.
The Board's interpretation of these statutes regarding "operation" is a reasonable reading of the language employed by the General Assembly. Unless defined in the statutory scheme, words and phrases are to be given their plain and ordinary meaning. Meyer, supra, 758 P.2d at 160. The legislative scheme does not define the terms management and operation. The dictionary defines "management" as follows:
 The conducting or supervising of something (as a business); esp: the executive function of planning, organizing, coordinating, directing, controlling, and supervising any industrial or business project or activity with responsibility for results.
Webster's Third New International Dictionary 1372 (1971). The term "operation" has a narrower meaning, as follows:
 A doing or performing of practical work or of something involving practical application of principles or processes . . . the operating of or putting and maintaining in action of something.
Id. at 1581. Use of the term "and" is plainly conjunctive, establishing that management agreements may include both management and operation. It is apparent from the above dictionary definitions that management and operation may be read as connoting the coordination of supply and service delivery as well as ultimate professional responsibility for the successful staging of events at, and the care of, the stadium. A contrary meaning is in no way evident or compelled, thereby entitling the Board's interpretation to deference in applying the Act. Mile High Enterprises, Inc. v. Dee, 192 Colo. 326,558 P.2d 568 (1977) (dispute over which agency of City and County of Denver had authority to execute amendment to concession agreement at Mile High Stadium, where either of two interpretations was plausible, resolved by deference to construction of City Charter urged by Mayor and City Council).
We are troubled, however, by the necessary consequence of the Board's interpretation, which is that mere assignment of funds the taxpayers would otherwise be entitled to receive as fair rent removes such funds from competitive selection requirements. The primary purpose of fair and competitive bidding is to secure competent vendors at the lowest possible cost to the taxpayers. 64 Am.Jur.2d Public Works and Contracts § 30 (1972). The Partnership's assumption of all operation and maintenance costs does not eliminate the taxpayers' interest in keeping costs down because the Partnership has promised the District a share of net income as additional rent to partially reimburse the District's investment in stadium construction.
We therefore conclude that, although the Board's interpretation of the Act is not incorrect, the Board has thereby created a duty to ensure that the Partnership's costs for services and supplies are reasonable. Without some form of competition, it is difficult to determine how the Board will evaluate the comparative reasonableness of the vendor costs committed to by the Partnership. Accordingly, we believe the Board should require selection of vendor subcontracts by the Partnership on a "fair and competitive" basis.
B. Timing of the Management Agreement
Section 32-14-125 provides that management agreements are to be negotiated and executed after the sales tax election and after the award of a team. The MOL was negotiated after the election, but prior to the franchise award. Both the District and the Partnership are unequivocal in maintaining that agreement in writing upon the fundamental financial arrangement was a marketing tool used to win the Denver franchise. Both sides believe Colorado would have lost its bid without the written expression of their conceptual intent to give the franchise the best possible chance of financial survival. However, both sides also agree in principal that the MOL, in its present form, is a legally binding contract.
The MOL provides in the "Recitals" on page one that the entire agreement is "subject to the grant of the Franchise." Since the District was protected against any financial liability in the absence of getting a team in Denver, the MOL does not violate the management statute. In this regard, the Partnership's receipt of a franchise award may be viewed as an express condition precedent to the District's obligation to perform.See United States v. McBride,571 F. Supp. 596, 607 (S.D. Tex. 1983) (applying Colorado contract law). Even if the MOL did not expressly state "subject to the grant of the franchise," the existence of a Denver major league baseball franchise, awarded by a third party over whom neither the District nor the Partnership had control, may also be viewed as an implied condition of the contract. See Parishv. Stratton Cripple Creek Mining Development Company,116 F.2d 207 (10th Cir. 1941), cert. denied, 312 U.S. 698,61 S.Ct. 738, 85 L.Ed. 1132. The failure to obtain a team would have been a failure of the entire contract subject matter, thereby ending the parties' obligations to further perform.Id. Therefore, until the National League announced its decision to put baseball in Denver, the District had no contractual obligations in violation of § 32-14-125.
We do not believe a court would conclude the timing language was intended to preclude the use of an executed agreement as a marketing tool in the franchise competition. Section 32-14-130, C.R.S. (1991 Supp.) specifically addresses the District's marketing limitations. The District may not use its own funds in the promotional effort. The timing language in § 32-14-125
appears intended simply to preclude a premature financial liability of the District. As stated above, no such liability existed prior to the grant of the baseball franchise.
C. Professional Management Organization
The management statute requires the District utilize "professional management organizations" to operate and manage the stadium. The term is defined to mean "a person, firm, or corporation having experience, expertise, and specialization in the management and operation of sports, entertainment, or convention facilities, or a particular area therein." Section32-14-125. Any such operator must also be an independent contractor. Id. The MOL provides at section 2(a), page 3, that "the District will designate the Partnership as the operator pursuant to C.R.S. 32-14-125." The MOL is merely an agreement in principle with intentional omissions on numerous matters of detail to be worked out later. Nothing in the MOL language relieves the Partnership of the obligation to qualify as an independent professional management organization in accordance with the statute, and nothing waives the District's right, nor its legal duty, to insist upon such qualification. The District asserts that the Partnership has a substantial financial incentive to hire the best personnel for the job because its own money is at stake, and that the District contractually and statutorily reserved the right to approve or disapprove the Partnership's qualifications. Generally, a distinct legal entity under contract and not subject to the direction and control of the District would qualify as an independent contractor. Continental Bus System v. NLRB,325 F.2d 267 (10th Cir. 1963).
Regardless of the MOL language, however, certain statutory requirements control. First, it is simply illegal for the Board to contract with anyone who, in their judgment, does not meet the statutory criteria for a professional management organization. Second, the management statute requires the use of independent contractors to operate and manage the stadium. The MOL rather clearly reflects the parties' understanding that they must comply with § 32-14-125 in detailing the operation and management aspects of the final agreement. Therefore, in the final negotiations, the Board must make an express finding that the Partnership so qualifies. Further, the final lease agreement must be more explicit regarding the Partnership's status as an independent contractor and, must contain "appropriate and reasonable provisions with respect to termination, default and legal remedies"; the District must not hire employees to operate the stadium and must clearly have the right to terminate the Partnership as operator if the Partnership fails to perform satisfactorily. Section 32-14-125 is clear on these points. What constitutes satisfactory performance, however, is a business judgment left to the Board's discretion, since the management statute also provides that any management agreement shall be "upon such terms and conditions which the board deems reasonable and necessary." Section 32-14-125. Such broad discretion precludes a legal interpretation that the right to terminate the Partnership as operator must be severable from the real property portion of the lease agreement. Since the MOL is not yet a management agreement, it does not violate § 32-14-125 in this regard. This fact further supports the earlier conclusion that the timing of the MOL was not premature.
VI. Sales Tax Election
The District is a statutorily created special district co-extensive with the Regional Transportation District ("RTD") and encompassing multiple local governments in the Denver metropolitan area. Section 32-14-104, C.R.S. (1991 Supp.). The District is expressly empowered to levy and collect a sales tax within the district upon the affirmative vote of a majority of the district's registered electors. Section 32-14-105, C.R.S. (1991 Supp.). The Board is directed to submit to the voters the question of levying the tax by § 32-14-105(1), C.R.S. (1991 Supp.), and is expressly directed by that subsection what to include in the ballot question. Section 32-14-105(2), C.R.S. (1991 Supp.) provides that the Board "may" include other relevant information, including without limitation the goal of fifty percent private funding for the stadium construction.
Generally, the language of ballot questions must accurately and fairly reflect the meaning of the underlying law to be approved or disapproved by the voters. See Say v.Baker, 137 Colo. 155, 322 P.2d 317 (1958) (action to modify ballot title and submission clause rejected as requiring expression of an opinion on the merits of the proposed constitutional amendment). The voters must not be misled by the language used in the question. See Dye v.Baker, 143 Colo. 458, 354 P.2d 498 (1960) (ballot title and submission clause for constitutional amendment permitting gambling invalidated for creating misleading impression that all legalized gambling required a license). The language chosen by the entity charged with drafting a ballot question is, however, entitled to a presumption of validity and will be held invalid only in clear cases of unfair or incorrect representation of the proposal being voted upon. See Bauch v.Anderson, 178 Colo. 308, 497 P.2d 698 (1972).
The ballot question submitted by the Board to the voters regarding baseball states as follows:
 Shall, in support of efforts to gain a major league baseball team for Colorado, the Denver Metropolitan Major League Baseball Stadium District be authorized to levy and collect a uniform sales tax throughout the district at a rate not to exceed one-tenth of one percent for a period not to exceed twenty years, with the proceeds to be used, along with funds from other sources including the private sector, for the costs relating to a major league baseball stadium to be located within the district, provided that the tax will be levied and collected only upon the granting of a major league baseball franchise by major league baseball to be located within the district?
The baseball sales tax question complies with the mandatory provisions of § 32-14-105(1). The voters were informed of the amount and duration of the tax, the proposed use of proceeds to construct a baseball stadium, and the condition that the tax be levied only upon the award of a franchise. The remaining question is whether or not the voters were misled by the ballot language as to the contribution of "funds from other sources including the private sector" toward stadium construction and operation.
The case law requires an analysis of whether those who voted for the tax would not have done so in the absence of such language.See Crowe v. Wheeler, 165 Colo. 289, 439 P.2d 50,52 (1968). Section 32-14-105(2) provides that the Board "may" include other relevant information in the ballot question, such as the fifty percent private funding target. The Board chose the phrase, "along with funds from other sources including the private sector." Might this language have been clearer with the phrase, "if any" tacked on? The answer may be "yes." But if reasonable minds can differ as to the adequacy of the language, the issue is not whether the ballot question could have been clearer. Say v. Baker, 137 Colo. 155, 322 P.2d 317,319 (1958). Rather the question is whether it is clear the language unfairly misrepresented the Board's underlying legal power to levy the full tax and build a stadium without any private funds. In this context, it must be remembered that the underlying Act does not require a specific level of contributions to stadium construction, nor does it require the voters be informed of that fact. As discussed earlier, our review of the legislative history also reveals that members of the General Assembly debated whether a specific level of privatization would be achieved. Nonetheless, given these facts the ballot question language is not so clearly misleading as to the use of sales tax proceeds that a court would conclude the affirmative votes were erroneously cast on the basis of such wording.
Even if a court could some how be persuaded the ballot question was misleading, any legal challenge at this late date to invalidate the election would fail. Such a challenge would bear the practically insurmountable burden of proving that the election results did not reflect the true will of the voting public. Crowe, supra. This means one would have to prove the vote would have gone the other way if different wording had been used. Further, in the context of such a challenge, the proponent would have to satisfactorily explain why the ballot language was not challenged prior to the election. The Act requires submission of the question to the Secretary of State ninety days prior to the election. Section 32-14-105(3), C.R.S. (1991 Supp.). Colorado courts take a very different view of actions to invalidate an election already held and actions to correct alleged irregularities prior to the vote. A post-election challenge must generally establish either violation of a mandatory statutory requirement or fraud. Kelly v.Novey, 136 Colo. 408, 318 P.2d 214, 215 (1957) (post-election challenge to procedural irregularities not alleging fraud failed to state a claim). In this case, no statutory requirement was violated and the Act called for two public hearings in every county within the district prior to the election, for purposes of answering the public's questions. Section 32-14-105(4), C.R.S. (1991 Supp.). We are told these meetings did in fact occur, and that virtually no one attended or asked questions.
Based upon the foregoing, we are unable to conclude a court would find the ballot question so misleading as to be fraudulent and thereby invalidate the sales tax election. While we are concerned that many voters may have believed a significant degree of private investment would be obtained, the ballot language used promises no private funding for stadium construction. The Act clearly empowers the Board to levy the tax for twenty years and build an entirely publicly-funded stadium, ifnecessary, to attract major league baseball to Denver. Nothing in the ballot question clearly misrepresents such facts.
VII. Constitutional Issues
The Act permits the District to issue special obligation bonds for the purpose of constructing a stadium, following voter approval of the sales tax levy. Section 32-14-117, C.R.S. (1991 Supp.). The Board is vested with the discretion to pledge, as security for such bonds, any or all revenues and escrowed assets of the District. Section 32-14-118, C.R.S. (1991 Supp.). Revenue bonds have in fact been issued for stadium construction and only the sales tax revenues have been pledged toward repayment.
The operating revenues have been used by the District to negotiate a so-called "triple-net" lease of the stadium. In that regard, the MOL authorizes the Partnership to receive all income from operation of the stadium, from which the Partnership must pay all operation and maintenance costs. This is generally consistent with the required uses of operating funds in §32-14-116(1). To effectuate this bargain, the Partnership has contractually undertaken operational responsibility for the stadium. If Partnership net income exceeds a five percent return on investment to each of the partners, the District is entitled to a share of such excess income as "additional rent." These facts have given rise to questions as to the constitutional validity of allowing the Partnership substantial retention of revenues derived from operation of a publicly owned facility.
Before turning to the MOL, we must first examine construction of the stadium. The District is a statutorily created special district and political subdivision of the state vested with the authority to levy a sales tax. Sections 32-14-104 and 32-14-105, respectively. As such, the District is subject to state constitutional prohibitions upon public indebtedness and aid to private businesses because the primary purpose of these proscriptions is to prohibit placing tax-generated public funds at risk for private gain. Colo. Const. art. XI, §§ 1 and 2;Lyman v. Town of Bow Mar, 188 Colo. 216, 533 P.2d 1129,1134 (1975). See also Milheim v. Moffat Tunnel ImprovementDistrict, 72 Colo. 268, 211 P. 649 (1922), aff'd,262 U.S. 710 (1923). Special obligation bonds of the District issued in full compliance with the Act clearly do not constitute an impermissible pledge or debt of the District's credit.See Allardice v. Adams County, 173 Colo. 133,476 P.2d 982 (1970); Colo. Const. art. XI, § 6. Further, the voters agreed by referendum to tax themselves for the specific purpose of financing construction of the stadium to be owned by the District.
Construction of the stadium involves no donation of public funds to private entities. While the Act envisions efforts to attract private investment in the stadium, no improper donation or commingling of funds is thereby created. The stadium will be a public facility owned by the District, which may not be sold for less than the amount of sales tax revenues used in its construction. § 32-14-129, C.R.S. (1991 Supp.). SeeDenver Urban Renewal Authority v. Byrne, 618 P.2d 1374,1383 (Colo. 1980). The General Assembly has also determined that construction of a baseball stadium will create jobs and stimulate economic development. Section 32-14-102. Similar findings of "discrete and particularized public purpose[s]" have been held sufficient to survive constitutional scrutiny under art. XI, § 2. In re Interrogatory Propounded by Governor RoyRomer on House Bill 91S-1005, 814 P.2d 875, 884 (Colo. 1991) (hereinafter the "United Airlines" case); seealso Ginsberg v. City and County of Denver,164 Colo. 572, 436 P.2d 685, 689 (1968) (scheme involving City revenue bonds and sale and lease-back contract, by which City acquired Mile High Stadium, held not an unconstitutional debt and in furtherance of a valid public purpose, recreation).
We must now analyze the MOL to determine if the specific financial arrangement agreed upon runs afoul of the constitution. Where a specific contract or other public/private bargain is challenged under art. XI, §§ 1 and 2, modern courts look primarily to the consideration received by the public entity in furtherance of a public purpose. Witcher,supra (City's reduction of rental payments due it on Royal Gorge Bridge, so that lessee could repair and improve structure, deemed constitutional in part because City owned the Bridge and would receive value beyond the term of the lease through extension of the Bridge's useful life).
Under the MOL, the Partnership receives revenues generated by its baseball games and other events. Sales taxes will build the stadium and event revenues will pay stadium operating costs. The District owns and controls the stadium by law, and has simply made a contractual bargain for its operation.[1] The final contract specifying performance standards and containing default, termination, and remedial provisions must ensure retention of ultimate control by the District.[2] The Partnership receives a return on investment from its efficient conduct of events. The District receives a quid pro quo
in the form of: (1) partnership performance of Stadium management services; (2) fees from associated facilities and services provided by the District (additional parking, etc.); (3) any additional rent which may be paid; (4) a 17-year commitment to play baseball in the stadium; (5) the Partnership's assumption of all projected, but uncertain, operation and maintenance costs; (6) approximately $9.5 million in concession and team fixtures contributed by the Partnership; and (7) a Partnership guarantee of payment of the District's administrative costs up to $150,000 per year if the District has insufficient revenues to meet its administrative expenses.
Thus, the MOL establishes a constitutionally sufficient quidpro quo. There remains some concern, however, because the maximum amount the Partnership may receive for its management services is not specifically fixed. Since the MOL provides for revenue sharing of excess profits as additional stadium rent, a mechanism exists to prevent an unconstitutional gift at taxpayer expense. We do note, however, that the MOL uses the term "net income of the Partnership" to define when excess profits are available for sharing. The constitutionality of the MOL in this respect ultimately depends upon a fair and reasonable definition of the Partnership's expenses in calculating net income, such that adequate consideration will continue to exist in the final agreement.
SUMMARY
The MOL presently satisfies basic contractual principles and we believe a court would enforce it in accordance with its terms. None of the matters addressed by the MOL is severable, but the parties are free to renegotiate anything they desire.
The MOL does not appear to be voidable on the basis of procedural defects leading to its execution by the District, including corporate regularity, open meetings, conflicts of interest and compliance with the letter of the Act. A disturbing appearance of impropriety and conflict existed as to one Board member. The prospect of immediate subsequent employment with an opposing party, or the simultaneous service to both sides, even on different issues and without compensation, pose real conflicts. While we have found nothing leading us to conclude a court would hold the MOL legally voidable, an apparent conflict of interest existed. Such conflicts could be precluded in the future by appropriate legislation.
The MOL is silent on the issue of capital improvements and therefore does not violate any provision of the Act. The Act requires that revenues generated from the use of the stadium be used to take care of it; sales tax revenues may not be used for capital improvements. The final agreement between the parties obviously should squarely address this issue to eliminate potential ambiguities about what is a capital improvement and how operating revenues will be set aside to meet contingencies.
The MOL's contemplation of the Partnership as operator of a public facility without competition is lawful in principle, but the final agreement must address several matters. The timing of the MOL regarding the Partnership as potential operator prior to award of a franchise is not a problem. The District's interpretation of the statutes is reasonable on several statutory construction grounds. Deference to the Board's interpretation under its unusually broad powers is therefore legally appropriate, whether or not the result is desirable as a business or policy matter. The Board should, however, require some form of competitive selection by the Partnership for all vendors, since the taxpayers retain an interest in the reasonableness of such expenses.
In addition to capital improvements, the final agreement must properly qualify the Partnership as a professional management organization and articulate continuing standards in this regard. Second, the District must have meaningful termination rights for both the lease and operational aspects, because statutory and constitutional requirements compel it.
The ballot question voted upon by the taxpayers was not unlawfully misleading and cannot be successfully challenged at this late date. The courts will not overturn an election unless a mandatory statutory requirement was violated or fraud is established. Whether or not the language used by the Board could have been better is not relevant, so long as it was not clearly fraudulent.
The conceptual public/private venture contemplated the Act, and the actual arrangement generally described in the MOL, are constitutionally permissible under existing case law. The final agreement, however, must remain consistent with constitutional constraints outlined in the opinion in order to survive judicial scrutiny.
Sincerely,
 GALE A. NORTON Attorney General
CONTRACTS CONFLICT OF INTEREST OPEN MEETINGS CONSTITUTIONS STATUTORY CONSTRUCTION ELECTIONS
Colo. Const. art XI, § 2
§§ 32-14-101 to 32-14-133, C.R.S. (1991 Supp.)
LEGISLATIVE BRANCH House of Representatives
The Memorandum of Lease for the proposed major league baseball stadium is a binding and enforceable agreement. From the facts known to us, the Memorandum of Lease is not voidable due to an unlawful conflict of interest under § 32-14-108, C.R.S. (1991 Supp.). The Memorandum of Lease does not violate § 32-14-116, C.R.S. (1991 Supp.) by failing to address capital improvements. The Memorandum of Lease's combination of the stadium lease and management into a single agreement does not violate the Denver Metropolitan Major League Baseball Stadium District Act, §§32-14-101 to 32-14-133, C.R.S. (1991 Supp.). The sales tax election results are not presently voidable. The Memorandum of Lease does not violate Colo. Const. art. XI, § 2.
[1] The Witcher v. Canon City case cited above is very closely on point here. The City allowed the private lessee to operate the bridge and associated concessions, and to collect all fees therefrom. A portion of the rent otherwise due the City was diverted to the lessee until the cost of refurbishing the bridge was fully amortized. The Colorado Supreme Court first characterized the bridge operating revenues as not public funds, and then went on to hold that, even if there was a commingling of public and private funds, the public purposes served by the arrangement and the consideration received by the City removed any constitutional infirmity under article XI of the Colorado Constitution.
[2] Thus, compliance with the requirements of 32-14-125 (the management statute) appears to be a constitutional, as well as a statutory, necessity.